# EXHIBIT A

# MAPLE STREET SENIOR HOUSING LIMITED PARTNERSHIP

## AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP

( )

W247361.4
FINAL 5/16/03

Page

**TABLE OF CONTENTS**

Page

PREAMBLE ...................................................................................................................

ARTICLE I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
ARTICLE II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
GENERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
2.2 Principal Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
2.3 Principal Place of Business; Resident Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
2.4 Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
2.5 Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
ARTICLE III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . . . . . . . . . . . . 20
CAPITAL CONTRIBUTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
3.1 General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
3.2 Withdrawal of Withdrawing Limited Partners; Admission of Investor Limited Partners
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
3.3 Special Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . : . . . . . . 21
3.4 Limited Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
3.5 Delivery of Capital Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
3.6 Treatment of Other Advances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
3.7 Capital Accounts; No Interest; Withdrawal . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
3.8 Liability of Limited Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
3.9 Provision of Other Amounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
ARTICLE IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
COMPLIANCE WITH AUTHORITY REQUIREMENTS;  PARTNERSHIP BORROWINGS
26
4.1 Authority Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
4.2 Authorization to the General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
4.3 Right to Mortgage. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
4.4 Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
ARTICLE V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
RIGHTS, POWERS AND OBLIGATIONS OF THE  . . . . .  GENERAL PARTNERS AND
LIMITATIONS THEREON           28
5.1 Exercise of Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.2 Duties and Authority of General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.3 Delegation of General Partners Authority; Tax Matters Partner . . . . . . . . . . . . . . 32
5.4 Lease, Conveyance or Refinancing of Assets of the Partnership . . . . . . . . . . . . . . 34
5.5 Restrictions on Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

W247361.4
FINAL 5/16/03

Page

5.6 Activities of Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
5.7 Dealing with Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
5.8 Indemnification and Liability of the General Partners . . . . . . . . . . . . . . . . 39
5.9 Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
5.10 Additional Covenants of General Partners . . . . . . . . . . . . . . . . . . . . 42
5.11 Obligation to Repair and Rebuild Apartment Complex . . . . . . . . . . . . . . 42
ARTICLE VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
    CERTAIN PAYMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
6.1 Development Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
6.2 Annual Local Administrative Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
6.3 Disposition Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
ARTICLE VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    ACCOUNTING, REPORTS, BOOKS, . . . . . . . BANK ACCOUNTS AND FISCAL YEAR
                                                44
7.1 Bank Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
7.2 Books of Account; Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
7.3 Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
7.4 Other Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
7.5 Tax Returns and Tax Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
ARTICLE VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    MANAGEMENT AGENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
8.1 Management Agent and Management Fee . . . . . . . . . . . . . . . . . . . . . . 46
ARTICLE IX  PROFITS AND LOSSES . . . . . . . . . . . . . . . . . . . . . . . . . . 47
ARTICLE IX PROFITS AND LOSSES . . . . . . . . . . . . . . . . . . . . . . . . . . 55
ARTICLE XI TRANSFER OF LIMITED PARTNER INTERESTS . . . . . . . . . . . . . 58
11.1 Assignment of Limited Partner Interests . . . . . . . . . . . . . . . . . . . . . 58
11.2 Substituted Partners; Admission . . . . . . . . . . . . . . . . . . . . . . . . . . 59
11.3 Assignees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
ARTICLE XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    WITHDRAWAL OF A GENERAL PARTNER; . . . . . . . . . NEW GENERAL PARTNER
                                                60
11.1 Withdrawal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
11.2 Effect of Withdrawal; Election to Continue Business . . . . . . . . . . . . . . . 61
11.3 Formation of New Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
11.4 Special Removal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
11.5 Additional General Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
11.6 Amendment of Schedule and Agreement . . . . . . . . . . . . . . . . . . . . . . 66
11.7 Survival of Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
ARTICLE XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
    DISSOLUTION AND TERMINATION OF THE PARTNERSHIP . . . . . . . . . . . . 66
12.1 Events Which Cause a Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . 66

W247361.4
FINAL 5/16/03

Page

12.2  Actions of Liquidating Agent Upon Dissolution  . . . . . . . . . . . . . . . . . . . . . . . 67
12.3  Statements on Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
12.4  Priority on Liquidation; Distribution of Non-Liquid Assets  . . . . . . . . . . . . . . . 67
12.5  Orderly Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
12.6  No Goodwill Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
ARTICLE XIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
Foreign Partners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
13.1  Certification of Non-Foreign Status  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
13.2  Withholding of Certain Amounts Attributable to Interests of Foreign Partners . . . . 69
ARTICLE XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
14.1  Law Governing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
14.2  Power of Attorney  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
14.3  Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.4  Partners Independently Bound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.5  Separability of Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.6  Address and Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.7  Computation of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.8  Titles and Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.9  Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.10 Agreement Binding  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
14.11 Parties in Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
14.12 Amendments; Other Actions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
14.13 Survival of Representations, Warranties and Agreements . . . . . . . . . . . . . . . . . 72
14.14 Further Assurances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
14.15 Remedies Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
14.16 Meetings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

W247361.4
FINAL 5/16/03

## MAPLE STREET SENIOR HOUSING LIMITED PARTNERSHIP

### AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP

AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP, dated as of May 1, 2003, by and among Francoeur Senior Housing, LLC ("FSHLLC") and Somersworth Community Development Corporation ("SCDC") as General Partners, Related Direct SLP LLC, a Delaware limited liability company, as Special Limited Partner, RCC Credit Facility, L.L.C., a Delaware limited liability company, as Limited Partner, and Capital Ideas, Inc., as Withdrawing Limited Partner.

### W I T N E S S E T H :

WHEREAS, the Partnership was formed as a limited partnership under the laws of the State pursuant to the Original Certificate and the Initial Agreement. The Original Certificate was filed with the Filing Office on April 2, 2003; and

WHEREAS, the parties hereto desire to enter into this Agreement to provide for, among other things, (i) the continuation of the Partnership, (ii) the admission of SCDC, the Limited Partner and the Special Limited Partner into the Partnership, (iii) the withdrawal of the Withdrawing Limited Partner from the Partnership, (iv) the payment of Capital Contributions by the Investor Limited Partners to the Partnership, (v) the reallocation of Profits, Losses, credits and distributions of Cash Flow and other proceeds of the Partnership among the Partners, (vi) the respective rights, obligations and interests of the parties hereto to each other and to the Partnership and (vii) certain other matters;

NOW, THEREFORE, in consideration of the covenants and agreements hereinafter set forth, the parties hereto agree that the Initial Agreement is hereby amended and restated in its entirety to read as follows:

### ARTICLE I.

### DEFINED TERMS

Capitalized terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I. Certain additional defined terms are set forth elsewhere

W247361.4
FINAL 5/16/03

in this Agreement.

"Accountants" means such firm or firms of independent certified public accountants as may be engaged by the General Partners with the Consent of the Special Limited Partner from time to time, and shall initially be Otis Atwell & Timberlake having an address at 980 Forest Avenue, Portland, Maine 04103.

"Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of any Fiscal Year of the Partnership, after giving effect to the following adjustments:

(i) credit to such Capital Account any amounts which such Partner is obligated to restore thereto pursuant to any provision of this Agreement or is deemed to be obligated to restore thereto pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii) debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"Admission Date" means the day on which the Limited Partner acquires its Interest pursuant to the terms of the Contribution Agreement.

"Affiliate" means, when used with reference to a specified Person, any (i) Person that directly or indirectly controls or is controlled by or is under common control with the specified Person, (ii) Person that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner or trustee, or with respect to which the specified Person serves in a similar capacity and (iii) Person that, directly or indirectly, is the beneficial owner of 10% or more of any class of equity securities of the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities. "Affiliate" of the Partnership or a General Partner does not include a Person who is a partner in one or more partnerships or joint ventures with the Partnership or any other Affiliate of the Partnership if such Person is not otherwise an Affiliate of the Partnership or such General Partner.

"Agreement" means this Amended and Restated Certificate and Agreement of Limited Partnership, as it may be amended from time to time.

"Apartment Complex" means the real property owned by the Partnership pursuant to consisting of approximately one (1) acre of land located in Somersworth, New Hampshire, as more

6

W247361.4

fully described in the Mortgage, together with (i) the one building containing 37 apartments and ancillary and appurtenant facilities (including those intended for commercial use, if any) being constructed or rehabilitated thereon and (ii) all furnishings, equipment and personal property used in connection with the operation thereof.

"Architect" means Burnell-Johnson Architects, and its successors and assigns.

"Assignment" (including the verb form "Assign" and the adjectival form "Assigned") means a valid sale, exchange, transfer or other disposition of all or any portion of an Interest.

"Assignor" means a Partner who makes an Assignment and "Assignee" means a Person who receives an Assignment.

"Authority" means any applicable housing finance authority, which is a public body corporate and politic created by the State, or other agency authorized to allocate Tax Credits and/or to issue bonds or other evidence of indebtedness to finance residential housing development. To the extent applicable, Authority shall also mean HUD, any government mortgage insurance or co-insurance agency, or any other governmental body or agency having jurisdiction over the operations of the Apartment Complex or that provides assistance to the Partnership, the Apartment Complex and/or its tenants and imposes requirements in connection with such assistance.

"Authority Insurance Obligation" means the obligation of any Authority to insure the Mortgage.

"Bankruptcy" or "Bankrupt" means, with respect to any Partner, such Partner making an assignment for the benefit of creditors, becoming a party to any liquidation or dissolution action or proceeding with respect to such Partner or any bankruptcy, reorganization, insolvency or other proceeding for the relief of financially distressed debtors with respect to such Partner, or a receiver, liquidator, custodian or trustee being appointed for such Partner or a substantial part of such Partner's assets and, if any of the same occur involuntarily, the same not being dismissed, stayed or discharged within 90 days; or the entry of an order for relief against such Partner under Title 11 of the United States Code. A Partner shall be deemed Bankrupt if the Bankruptcy of such Partner shall have occurred and be continuing, subject to the cure period set forth in the immediately preceding sentence.

"Break-Even Date" has the meaning ascribed thereto in the Development Deficit Guaranty Agreement.

"Capital Account" means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(i) to each Partner's Capital Account there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Profits, and any items in the nature of income or gain which are specially allocated pursuant to Article IX hereof, and the amount of any

7

Partnership liabilities assumed by such Partner or which are secured by any property distributed to such Partner;

(ii)  to each Partner's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses which are specially allocated pursuant to Article IX hereof, and the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership;

(iii) in the event any Interest is Assigned in accordance with the terms of this Agreement, the Assignee shall succeed to the Capital Account of the Assignor to the extent it relates to the Assigned Interest; and

(iv) in determining the amount of any liability for purposes of clauses (i) and (ii) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Regulations, and shall be interpreted and applied in a manner consistent with such Regulations.  In the event the General Partners shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Partnership or the Partners), are computed in order to comply with such Regulations, the General Partners may make such modification with the Consent of the Special Limited Partner, provided that the Special Limited Partner shall Consent if it is not likely to have a material effect on the amounts distributable to any Partner pursuant to Article X hereof upon the dissolution of the Partnership.  The General Partners, with the Consent of the Special Limited Partner, also shall (a) make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Partners and the aggregate amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes in accordance with Section 1.704-1(b)(2)(iv)(q) of the Regulations, and (b) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Regulations.

"Capital Contributions" means, with respect to any Partner, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Partnership with respect to the Interest held by such Partner pursuant to the terms of this Agreement in accordance with Schedule A attached hereto. The Deferred Contributions or the principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Partnership by the maker of such note shall not be included in the Capital Contribution of any Person until the Partnership makes a taxable disposition of such obligations or until (and to the extent) such Deferred Contributions or principal payments on such note are made, as the case may be, all in

W247361.4

accordance with Section 1.704-1(b)(2)(iv)(d)(2) of the Regulations. Any reference in this Agreement to the Capital Contribution of a then Partner shall include the contributions to the capital of the Partnership made by any predecessor in interest of such Partner in respect of such Interest of such Partner.

"Capital Note" means the promissory note issued by the Limited Partner to the Partnership pursuant to Section 3.5 hereof.

"Cash Expenditures" means all disbursements of cash during the Fiscal Year (excluding distributions to Partners), including, without limitation, payment of operating expenses, payment of principal and interest on the Partnership's indebtedness (excluding payments of principal and interest on Voluntary Loans and Operating Loans), cost of repair and restoration of the Apartment Complex, amounts allocated to reserves by the General Partners and the payment of the fees set forth in Article VI hereof. In addition, the net increase during the year in any escrow account or reserve maintained by or for the Partnership shall be considered a cash expenditure during the year. Cash Expenditures payable to Partners or Affiliates of Partners shall be paid after Cash Expenditures due and payable to third parties.

"Cash Flow" means the amount, if any, by which Cash Receipts exceeds Cash Expenditures. Cash Flow shall be determined separately for each Fiscal Year or portion thereof.

"Cash Receipts" means all cash receipts of the Partnership from whatever source derived other than from a Sale or Refinancing Transaction, including, without limitation, cash from operations, any amounts attributable to construction or development savings, net insurance recoveries (other than proceeds from title insurance recoveries), and Capital Contributions. In addition, the net reduction in any year in the amount of any escrow account or reserve maintained by or for the Partnership shall be considered a cash receipt of the Partnership for such year. Notwithstanding the foregoing, at the election of the General Partners, Cash Receipts received near the end of a Fiscal Year and intended for use in meeting the Partnership's obligations (including the cost of acquiring assets or paying debts or expenses) in the subsequent Fiscal Year shall not be deemed received until such following year.

"Certificate" means the Original Certificate or any other instrument filed in the Filing Office as the Certificate of Limited Partnership of the Partnership in accordance with the Uniform Act, as amended from time to time.

"Class" means a specific class or grouping of Partners (i.e., the General Partners, the Limited Partner, the Investor Limited Partners or the Special Limited Partner).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute.

"Completion" shall have the meaning specified in the Contribution Agreement.

9

"Compliance Period" shall have the meaning provided in Section 42(i)(1) of the Code.

"Consent of the Special Limited Partner" means the prior written consent or approval of the Special Limited Partner, which may be granted or withheld in its sole discretion.

"Construction Contract" means the construction contract to construct or rehabilitate the Apartment Complex dated December 9, 2002 between the Partnership and the Contractor, as it may be amended from time to time.

"Contractor" means Horne Construction Company, Inc., and its successors and assigns.

"Contribution Agreement" means the Contribution Agreement dated of even date herewith, among the General Partners and the Limited Partner.

"Credit" or "Credits" means the low income housing tax credit allowable under Section 42 of the Code.

"Credit Conditions" means, for the duration of the Compliance Period, any and all restrictions including, but not limited to, applicable Federal, state and local laws, rules and regulations, including any obligations undertaken pursuant to the application for Credits for which the Partnership received points under the relevant Authority's scoring procedures, which must be complied with in order to qualify for the Credits or to avoid an event of recapture in respect of the Credits.

"Credit Period" shall have the meaning specified in Section 42 of the Code.

"Deed" means the Warranty Deed to be delivered by Jeffrey F. Francoeur, Jr. to the Partnership with respect to the Land and any document relating thereto.

"Deferred Development Fee" has the meaning set forth in Section 6.1 hereof.

"Depreciation" means, for each Fiscal Year of the Partnership or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for Federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year or other period bears to such beginning adjusted tax basis; provided, however, that if the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partners.

10

"Developer" means Francoeur Realty, LLC

"Development Agreement" means the agreement by and between the Partnership and the Developer pursuant to which the Developer has rendered or will render certain services to the Partnership in connection with the development of the Apartment Complex.

"Development Budget" shall mean the Construction Budget attached to the Contribution Agreement as Schedule 8.

"Development Deficit" shall have the meaning provided in the Development Deficit Guaranty Agreement.

"Development Deficit Guaranty Agreement" means the agreement of the Guarantor to fund Development Deficits, which shall be substantially in the form of Exhibit E annexed to the Contribution Agreement.

"Development Expenditures" means the costs incurred or to be incurred to (a) acquire, rehabilitate and equip the Apartment Complex through Completion in conformity with the Project Documents and the Plans and Specifications (other than the Development Fee), (b) pay all other expenses and costs associated with respect to financing the Construction of the Apartment Complex through the Break-Even Date, and (c) pay all other costs incident to the Construction of the Apartment Complex through the Break-Even Date (other than the normal operating expenses of the Apartment Complex and costs incurred by the Partnership in connection with the litigation of administrative determinations regarding Federal tax matters).

"Development Fee" has the meaning set forth in Section 6.1.

"Development Sources" means the aggregate of (i) the proceeds of the Mortgage Notes (which to the extent of any proceeds received from a refinancing of any construction financing shall include only the net proceeds of such refinancing) and any grants received by the Partnership, (ii) the Capital Contributions actually paid or agreed to be paid and (iii) available operating income of the Apartment Complex prior to the Break-Even Date.

"Development Surplus" means the excess of Development Sources over Development Expenditures.

"Entity" means any general partnership, limited partnership, limited liability company corporation, joint venture, trust, business trust, cooperative or association.

"Filing Office" means the Secretary of the State.

"Fiscal Year" has the meaning set forth in Section 7.2 hereof.

11

W247361.4

"Foreign Partner" means a Partner who at the time of acquisition of such Partner's Interest is a United States citizen or a resident alien of the United States and whose status subsequently changes to that of a non-resident alien of the United States.

"Foreign Person" means a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate, within the meaning of Sections 897, 1445 and 1446 of the Code.

"General Partner" or "General Partners" means any or all Persons designated as General Partners in Schedule A, including, without limitation, the Managing General Partner, and any Person or Persons who, at the time of reference thereto, have been admitted as additional or successor General Partners, in each such Person's capacity as a general partner of the Partnership. If there is only one General Partner of the Partnership, the term "General Partners" shall be deemed to refer to such General Partner.

"Governmental Agreements" means all agreements between the Partnership and any Authority with respect to the Apartment Complex and relating to insuring, supplementing, subsidizing, endorsing or otherwise affecting a Mortgage on the Apartment Complex (including, without limitation, any Regulatory Agreement); bond financing secured by any such Mortgage; Authority Insurance Obligation, Rental Assistance Contract; or tax abatements, concessionary financing or grants, or other governmental assistance to the Apartment Complex or its tenants, regardless of its nature, in each case as the same may be amended from time to time.

"Gross Asset Value" means, with respect to any asset owned by the Partnership, the asset's adjusted basis for Federal income tax purposes, except as follows:

(i)  the initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partners;

(ii)  the Gross Asset Value of each asset shall be adjusted to equal its respective gross fair market value, as determined by the General Partners, as of the following times:  (a) the acquisition of an additional Interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of property as consideration for an Interest; and (c) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations; provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partners reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)  the Gross Asset Value of any asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution; and

12

(iv) the Gross Asset Value of each asset shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such asset pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustment is taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations and Article IX hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the General Partners determine that an adjustment pursuant to clause (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Guarantor" means, collectively, Francoeur Senior Housing LLC, David Francouer and Jeffrey Francouer.

"Guaranty Period" means the period during which the Guarantor is obligated to fund any Operating Deficit pursuant to the Operating Deficit Guaranty Agreement.

"HUD" means the United States Department of Housing and Urban Development, or any successor Federal agency.

"Improvements" shall have the meaning specified in the definition of Apartment Complex.

"Initial Agreement" means the Agreement of Limited Partnership dated November __, 2002 among FSHLLC as general partner and the Withdrawing Limited Partner as limited partners.

"Interest" means the entire ownership interest of a Partner in the Partnership at any particular time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all terms and provisions of this Agreement.

"Investor Limited Partners" means the Limited Partner and the Special Limited Partner and any Substituted Investor Limited Partner.

"Involuntary Withdrawal" means any Withdrawal caused by the death, adjudication of insanity or incompetence, liquidation, dissolution or Bankruptcy of a General Partner.

"Land" shall have the meaning specified in the definition of Apartment Complex.

"Land Documents" means the Deed and the Title Policy.

13

"Lender" means any lender under any mortgage constituting the Mortgage.

"Limited Partner" means RCC Credit Facility, L.L.C., a Delaware limited liability company, and any person who becomes a Substituted Limited Partner in respect of any portion of the Limited Partner Interest of the Limited Partner as provided in Article X hereof. The term does not include the Special Limited Partner.

"Liquidating Agent" shall have the meaning provided in Section 13.2 hereof.

"Management Agent" means the person approved by each Authority and Lender, if required, selected to provide management services to the Apartment Complex from time to time in accordance with Article VIII hereof.

"Management Agreement" means the agreement between the Partnership and the Management Agent in connection with management of the Apartment Complex entered into pursuant to the authority granted by Article VIII hereof.

"Managing General Partner" means the Somersworth Community Development Corporation initially, and its successors and assigns, as Managing General Partner pursuant to the provisions of Section 5.3 hereof.

"Mortgage" means any mortgage or deed of trust securing an indebtedness of the Partnership evidenced by the Mortgage Note and encumbering the Apartment Complex, as such indebtedness may be increased, decreased or refinanced in accordance with this Agreement and the Project Documents. Where the context admits, the term "Mortgage" shall include any mortgage, deed, deed of trust, note, regulatory agreement, security agreement, assumption agreement or other instrument executed in connection with a Mortgage Note which is binding on the Partnership; and in case any Mortgage is replaced or supplemented by any subsequent mortgage or mortgages, the "Mortgage" shall refer to any such subsequent mortgage or mortgages.

"Mortgage Note" means any promissory note held by a Lender evidencing the indebtedness secured by the Mortgage.

"Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" shall have the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Operating Deficit" shall have the meaning provided in the Operating Deficit Guaranty Agreement.

"Operating Deficit Guaranty Agreement" means the agreement of the Guarantor to

14

W247361.4

fund Operating Deficits, which shall be substantially in the form of Exhibit F annexed to the Contribution Agreement.

"Operating Loans" means loans made by the Guarantor to the Partnership pursuant to the Operating Deficit Guaranty Agreement to fund Operating Deficits occurring during the Guaranty Period, which loans do not bear interest and are repayable only as provided in Article IX hereof.

"Original Certificate" means the Limited Partnership Registration dated April 2, 2003 executed by the General Partner as general partner.

"Other Guarantees" means any other guarantees made by Guarantor in connection with the Contribution Agreement.

"Partner" or "Partners" means any or all of the General Partners, the Limited Partner and the Special Limited Partner.

"Partner Nonrecourse Debt" shall have the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Partner Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partner Nonrecourse Deductions" shall have the meaning set forth in Section 1.704-2(i)(2) of the Regulations.

"Partnership" means the limited partnership governed by this Agreement, as such limited partnership may from time to time be amended or reconstituted.

"Partnership Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Regulations.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

"Prime Rate" means the rate of interest publicly announced from time to time by Chase Manhattan Bank, New York, New York, as its prime rate.

"Profits" and "Losses" means, for each Fiscal Year of the Partnership or other period, an amount equal to the Partnership's taxable income or loss for such Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

15

W247361.4

(i)   any income of the Partnership that is exempt from Federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii)   any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss;

(iii)  in the event the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (ii) or (iii) of the definition thereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)  gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)   in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period; and

(vi)  notwithstanding any other provisions hereof, any items which are specially allocated pursuant to Article IX hereof shall not be taken into account in computing Profits or Losses.

"Project Documents" means the Construction Contract, the Governmental Agreements, the Land Documents, the Management Agreement, the Mortgage, the Mortgage Note, the Contribution Agreement, and any other document related to the financing, development or construction of the Apartment Complex, as any such documents may be amended from time to time.

"Recapture Guaranty Agreement" means the Recapture Guaranty Agreement in substantially the form of Exhibit H, annexed to the Contribution Agreement.

"Regulations" means the Income Tax Regulations (including Temporary Regulations) promulgated under the Code.

"Regulatory Agreement" means any regulatory agreements and/or declarations of covenants and restrictions or extended use agreements to be entered into between the Partnership and the Lender and/or any Authority setting forth certain terms and conditions under which the Apartment Complex is to be operated or restricting rental charges and/or incomes of the residents thereof.

"Rental Assistance Contract" means any contract between the Partnership and HUD or other Authority providing for annual rental subsidies for the Apartment Complex or tenants therein.

16

"Replacement Reserve Guaranty Agreement" means the agreement of the Guarantor to fund reserves required to be maintained by the Partnership pursuant to Section 5.2.D hereof in the form of Exhibit G, annexed to the Contribution Agreement.

"Return Amount" shall have the meaning ascribed to such term in Section 10.4 hereof.

"Sale or Refinancing Transaction" means any of the following items or transactions not in the ordinary course of business:  a sale, transfer, exchange or other disposition of all or substantially all of the assets of the Partnership, a condemnation of or casualty at the Apartment Complex or any part thereof, a claim against a title insurance company, the refinancing of any Mortgage Note or other indebtedness of the Partnership and any similar item or transaction; provided, however, that neither distributions which are deemed returns of capital for Federal income tax purposes nor the payment of Capital Contributions by the Partners shall be included within the meaning of the term "Sale or Refinancing Transaction."

"Sale or Refinancing Transaction Proceeds" means all cash receipts of the Partnership arising from a Sale or Refinancing Transaction (including principal and interest received on a debt obligation received as consideration, in whole or in part, on a Sale or Refinancing Transaction).

"Special Limited Partner" means Related Direct SLP LLC., a Delaware limited liability company, and its successors and assigns.

"State" means the state in which the Partnership is organized.

"Substituted Partner" means any transferee of the Interest of a Partner who is admitted to the Partnership as a successor partner in respect of the Interest of such Partner.

"Tax Matters Partner" means the Partner designated from time to time as the Tax Matters Partner of the Partnership pursuant to Section 5.3.D hereof.

"Title Policy" means Policy of Title Insurance Commitment No. 822-469748 of Commonwealth Land Title Insurance Company dated April 9, 2003, and all the documents relating thereto.

"Unavoidable Events" means strikes, acts of God, governmental restrictions (other than those contained in Governmental Agreements), severe or unusual shortages of labor or materials, enemy action, riot, civil commotion, fire, unavoidable casualty or other causes beyond the reasonable control of a party.  Lack of funds shall not be deemed a cause beyond the control of a party.

"Uniform Act" means the Uniform Limited Partnership Act, or its equivalent, as it may be adopted or amended from time to time by the State, or any successor statute governing the operation of limited partnerships.

17

"United States Real Property Interest" means any direct or indirect interest in United States real property as defined in Section 897(c) of the Code and the Income Tax Regulations promulgated thereunder.

"Voluntary Loan" means a voluntary, unsecured interest-bearing loan of any Partner to the Partnership as described in Section 4.4 hereof.

"Withdrawing" or "Withdrawal" (including the verb form "Withdraw" and the adjectival forms "Withdrawing" and "Withdrawn") means, as to a General Partner, the occurrence of the death, adjudication of insanity or incompetence, Bankruptcy, dissolution or liquidation of such Partner, or the withdrawal, removal or retirement from the Partnership of such Partner for any reason, including any Assignment of its Interest and those situations when a General Partner may no longer continue as a General Partner by reason of any law or pursuant to any terms of this Agreement.

"Withdrawing Limited Partner" means Capital Ideas, Inc.

\* \* \*

Each definition or pronoun herein shall be deemed to refer to the singular, plural, masculine, feminine or neuter as the context requires. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

## ARTICLE II

### GENERAL

2.1   Continuation of the Partnership.

A.   The Partnership shall be continued as a limited partnership pursuant to this Agreement.   The name of the Partnership shall continue to be "MAPLE STREET SENIOR HOUSING LIMITED PARTNERSHIP" or such other name selected by the General Partners with the Consent of the Special Limited Partner as may be acceptable to the appropriate recording officials of the State.

B.   As soon after the execution of this Agreement as is practicable, the General Partners shall file (if required by the Uniform Act) an amendment to the Certificate reflecting the provisions of this Agreement in accordance with the Uniform Act. The General Partners shall from time to time take all such other actions as may be deemed by them to be necessary or appropriate to (i) effectuate and permit the continuation of the Partnership as a limited partnership under the laws of the State, (ii) enable the Partnership to do business in the State and (iii) protect the limited liability of the Limited Partner under the laws of the State including the preparation and filing of such amendments to this Agreement and any other certificate, document or instrument as may be required

18

under the laws of the State.  The Partners shall execute such certificates, documents and instruments and take such other action as may be necessary to enable the General Partners to fulfill their responsibilities under this Section 2.1.B.  The power of attorney granted in Section 15.2 hereof may be exercised by the General Partners to effect the provisions of this Section 2.1.B.

2.2  Principal Office.  The principal office of the Partnership shall be located c/o Somersworth Housing Authority, 9 Bartlett Avenue, Somersworth, New Hampshire 03878.  The General Partners may maintain such other offices on behalf of the Partnership in the State as they may from time to time deem advisable.  The Partnership's books and records will be made available to the Investor Limited Partners or their representatives at the Partnership's principal office at all times and for any purpose.  The principal office of the Partnership may be changed by the General Partners, in which event written notice thereof shall be given by the General Partners to all the other Partners.

2.3  Principal Place of Business; Resident Agent.    The principal place of business of the Partnership shall be Maple Street, Somersworth, New Hampshire , at the location of the Apartment Complex.    The Partnership's books and records shall be maintained at the offices of David Francoeur, 828 Central Avenue, Dover, New Hampshire 03802.    David A. Francoeur, 828 Central Avenue, Dover, New Hampshire 03802 has been appointed the Partnership's resident agent for the service of process in the State.

2.4  Term.  The Partnership shall continue in full force and effect until the dissolution and termination of the Partnership pursuant to Article XII hereof.

2.5  Purpose.

A.  The specific business and purpose of the Partnership is investment in real property and the provision of low income housing through the construction, renovation, rehabilitation, operation (including conversion to cooperative or condominium form of ownership and the sale of apartment units, if permitted) and leasing of the Apartment Complex and any commercial space located therein, and in connection therewith, subject to and in accordance with the permission of each applicable Authority and all Governmental Agreements, to make and perform contracts and other undertakings and to engage in any and all activities and transactions as may be necessary or advisable in connection therewith, including, but not limited to, the purchase, transfer, mortgage, pledge and exercise of all other rights, powers, privileges and other incidences of ownership with respect to the Apartment Complex and to borrow or raise money without limitation as to amount or manner and to carry on any and all activities related to any of the foregoing.

B.  In order to carry out its business and purpose under Section 2.5.A hereof, subject to the terms and conditions hereof, the Partnership is hereby authorized, in addition to the powers set forth in the Uniform Act, to:

(i)  acquire, own and lease real property, and to hold such property for investment purposes;

19

W247361.4

(ii) construct, renovate, rehabilitate, own, maintain and operate the Apartment Complex;

(iii) mortgage, lease, transfer and exchange or otherwise convey and encumber such property and the improvements thereon (including conversion to cooperative or condominium form of ownership and the sale of apartment units) in furtherance of any and all of the objects of its business in connection with the Apartment Complex;

(iv) enter into, perform and carry out contracts of any kind necessary to, or in connection with or incidental to, the construction, renovation, rehabilitation, ownership, financing, maintenance and operation of the Apartment Complex, including, but not by way of limitation, any contracts with any Authority which may be desirable or necessary to comply with the requirements of such Authority, including any agreements relating to regulations or restrictions contained in any mortgages as to rents, sales, charges, capital structure, rate of return and methods of operation;

(v) rent dwelling units and commercial space, if any, therein from time to time in accordance with applicable Federal, state and local regulations, in such a manner so as to qualify for Credits, collect the rents therefrom, pay the expenses incurred in connection therewith, and distribute the net proceeds to the Partners, subject to any requirements which may be imposed by any Authority; and

(vi) purchase, transfer, mortgage, pledge and exercise all other rights, powers, privileges and other incidences of ownership with respect thereto and borrow or raise money without limitation as to amount or manner and carry on any and all activities incidental and appropriate to effectuate the purposes of the Partnership.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1 General Partners. The Capital Contributions of the General Partners are set forth in Schedule A. The General Partners shall not be required to make any additional Capital Contributions to the Partnership except to the extent provided in Sections 3.7 and 6.1 hereof. The General Partner has received its Interest in the Partnership as consideration for locating the Land and obtaining the agreement of the Limited Partner to invest in the Partnership.

3.2 Withdrawal of Withdrawing Limited Partners; Admission of Investor Limited Partners. The Withdrawing Limited Partners hereby withdraw as Partners of the Partnership. The Limited Partner and the Special Limited Partner are hereby admitted to the Partnership as the Investor Limited Partners. The Withdrawing Limited Partners acknowledge that they have no further interest

20

as limited partners in the Partnership as of the Admission Date, have released all claims, if any, against the Partnership arising out of their participation as Partners and shall be deemed to have withdrawn as limited partners of the Partnership as of such date.

3.3 <u>Special Limited Partner.</u>  The Capital Contribution of the Special Limited Partner is set forth in Schedule A. The Special Limited Partner shall be in a different class from the Limited Partner and, except as otherwise expressly stated in this Agreement, shall not participate in any rights allocable to or exercisable by the Limited Partner under this Agreement.

3.4 <u>Limited Partner.</u>

A.  Subject to compliance with the terms and conditions hereinafter set forth, the Limited Partner shall make Capital Contributions of $1,911,000 payable in four installments as follows:

(i)  $286,650 [15%] (the "First Installment") shall be payable on the Admission Date and upon the delivery of all "Closing Documents" identified in Section 4(c) of the Contribution Agreement;

(ii)  $286,650 [15%] (the "Second Installment") shall be payable upon delivery of the "75% Completion Certificate" in the form attached as Exhibit J to the Contribution Agreement and satisfaction of the other conditions set forth in Section 5(a) of the Contribution Agreement.

(iii)  $955,500 [50%] (the "Third Installment") shall be payable upon satisfaction of the "Third Contribution Payment Conditions" and the delivery of the "Third Contribution Documents" as such terms are defined in Sections 5(b) and 5(c) of the Contribution Agreement; and

(iv) $382,200 [20%] (the "Fourth Installment") shall be payable upon satisfaction of the "Fourth Contribution Payment Conditions" and the delivery of the "Fourth Contribution Documents" as such terms are defined in Sections 5(d) and 5(e) of the Contribution Agreement.

B. (i) The amount of Limited Partner's Capital Contributions were determined in part upon the amount of Credits that are expected to be available to the Partnership upon Completion, and were based upon the assumption that the Limited Partner would be eligible to claim annual Credits of not less than: $244,456 for each of the years 2006 through 2013;  $213,899 for 2004 ("First Year Credits"); and $244,456 for 2005 ("Second Year Credits") and $30,557 in 2014. The amount of the qualified basis of the Apartment Complex and the annual rate of the Credits which the Partnership will be able to claim with respect thereto will not be known until Completion. Therefore, if the annual amount of Credits which the Partnership will be entitled to claim, as certified to the Limited Partner by the Accountants upon Completion, is (a) less than $244,456, the principal amount of the Capital Note shall be reduced by $0.7818 for each $1.00 by which $244,456 exceeds the annual Credits

21

which the Accountants certify upon Completion that the Partnership will be entitled to claim, or (b) more than $244,456, the principal amount of the Capital Note shall be increased by $0.7818 for each $1.00 by which the annual Credits which the Accountants certify upon Completion that the Partnership will be entitled to claim exceeds $244,456. The amount by which the Capital Note is decreased or increased, as the case may be, shall be applied to the payment of the Fourth Installment, provided that to the extent that the decrease in the Capital Note is greater than the Fourth Installment, then the General Partner and/or the Guarantors shall promptly after demand by the Limited Partner, make payment of such remaining amount to the Limited Partner in immediately available funds. Notwithstanding the foregoing, the Capital Note shall not be increased unless the Limited Partner has available funds ("Available Funds") in order to increase the Capital Note. For these purposes, any funds theretofore previously earmarked by the Limited Partner to make other investments, or to be held as reserves, shall not be considered Available Funds. In the event that the Limited Partner does not have available funds for such purpose, the Limited Partner shall use its reasonably best efforts to procure another investor limited partner to be admitted to the Partnership in order to make a capital contribution for the amount by which the Limited Partner lacks Available Funds. If [a] within 20 days from receipt of the Accountant's certification, the Limited Partner fails to increase its Capital Contribution in order to purchase the excess Credits as set forth above (the "Additional Credits") or [b] the Limited Partner fails to procure a third party which shall be an "Accredited Investor" within the meaning of Regulation D under the Securities Act of 1933 and will purchase the Additional Credits at a price no less than $0.7818 for each $1.00 of Credits and act as a Class B Limited Partner (which Class B Limited Partner shall have the right to receive the Adjusted Allocation (as defined below) but shall not have the right to exercise any other rights granted to the Investor Limited Partners under this Agreement or pursuant to the Uniform Act, except as may be required by the Uniform Act, and which Class B Limited Partner shall grant to the Special Limited Partner upon its admission to the Partnership its exclusive proxy to take any and all actions which may be taken by the Investor Limited Partners on behalf of the Class B Limited Partner), then, the General Partner shall have the right to require that the Limited Partner's percentage interest in allocations of Profits, Losses and Credits and distributions of Cash Flow and Sale or Refinancing Transaction Proceeds shall be decreased in proportion to the amount that the increased Capital Contribution not made by the Limited Partner above bears to the amount of Capital Contribution made by the Limited Partner (adjusted to include the increased Capital Contribution not paid by the Limited Partner), and such decrease (the "Adjusted Allocation") shall be reallocated to the General Partner or, with the Consent of the Special Limited Partner, an Assignee of the General Partner. In the event that the Accountants determine that any or all of the First Year Credits and/or the Second Year Credits (after any adjustments pursuant to the preceding provisions of this Section 3.4.B(i) have been made) are to be deferred to a later year, then the principal amount of the Capital Note shall be reduced by an amount equal to $0.7528 for each $1.00 by which the First Year Credits are less than $ $213,899, plus an amount equal to $0.7528 for each $1.00 by which the Second Year Credits are less than $244,456, and the amount by which the Capital Note is decreased shall be applied to the payment of the Fourth Installment, provided, that in the event that the decrease in the Capital Note is greater than the Fourth Installment, then the General Partner and/or the Guarantors shall promptly after demand by the Limited Partner, make payment of such remaining amount to the Limited Partner in immediately available funds.

W247361.4

(ii) The $244,456 amount specified in Section 3.4.B(i) and the $244,456 amount specified in Section 10.4 shall be adjusted in proportion to any adjustment to the $244,456 amount made pursuant to Section 3.4.B(i). The $244,456 amount specified in Section 12.4.A shall be adjusted to the amount of Credits which the Accountants certify pursuant to Section 3.4.B(i) hereof.

(iii) [Intentionally Omitted].

(iv) If the Special Limited Partner shall disagree as to the amount of Credits to which the Accountants certify pursuant to this Section 3.4.B, the Special Limited Partner shall notify the General Partners of such disagreement within 20 days after delivery of such certification to the Limited Partner, and the Limited Partner shall pay that portion of the principal amount of the Capital Note based on that portion of Credits not in dispute. With respect to the amount of such credits in dispute, within five days after the giving of the notice specified in this Section 3.4.B(iv), the General Partners and the Special Limited Partner shall each designate a certified public accountant as an arbitrator and such two arbitrators shall designate a third arbitrator (or if the first two arbitrators cannot agree upon a third arbitrator within 20 days, such third arbitrator shall be chosen by the American Arbitration Association). The designation of arbitrators hereunder shall automatically delay the due date for payment of the Capital Note until ten days after the conclusion of such arbitration (unless prior to the expiration of such period the General Partners and the Special Limited Partner agree upon the amount of Credits which the Partnership is entitled to claim). Such arbitrators shall be directed to promptly conduct, at the expense of the Partnership, an arbitration to determine by majority vote the amount of Credits which the Partnership is entitled to claim on a basis that is prudent and defensible in light of the obligations of the Limited Partner to its public investors. Such arbitrators shall be directed to give notice of their determination within 60 days after the giving of the notice specified in this Section 3.4.B(iv), and upon the giving of such notice of determination the amount determined by majority vote of such arbitrators shall be deemed the amount of Credits which the Partnership is entitled to claim for all purposes hereof. Upon the determination of the amount of Credits which the Partnership is entitled to claim, the principal amount, if any, remaining to be paid under the Capital Note shall be adjusted accordingly and paid when due.

C. The Limited Partner's obligation to pay each Installment after the First Installment is non-recourse to the Limited Partner except to the extent of the Limited Partner's Interest, which shall be pledged as security for such obligation pursuant to a Pledge Agreement in substantially the form of Exhibit A attached hereto, and is subject to (i) satisfaction of the condition precedent thereto set forth in Section 3.4.A(ii) hereof, (ii) delivery of the certifications specified in Section 3.4.B hereof and (iii) certification by the General Partners to the Limited Partner that (a) the Note Payment Conditions (as defined in the Contribution Agreement) have been satisfied, (b) no default has been declared under any of the Project Documents and is continuing, (c) the General Partners are not in material default in any of their obligations under this Agreement, (d) the General Partners have no knowledge of any material default under any of the Project Documents and (e) no Bankruptcy of a General Partner has occurred and is continuing. The General Partners shall give the Limited Partner at least 20 days' advance written notice of the due date for each Installment after the First Installment,

23

which notice shall contain the aforementioned certification and shall state that all conditions precedent to the payment of such Installment have been satisfied.

D.  If within 20 days prior to the date when any Installment after the First Installment would otherwise be due, the certification and statement required by Section 3.4.C hereof cannot be given, the Limited Partner shall not then be required to pay such Installment; provided, however, that if the General Partners shall thereafter deliver the certification and statement specified in Section 3.4.C hereof, the Limited Partner shall pay the amount of such Installment then due and payable to the Partnership 20 days after delivery of such certification and statement of the General Partners.

E.  The Limited Partner's Capital Contributions shall be applied first to the satisfaction of the costs of the Development Expenditures (including, subject to the consent of the Lender), and then to the payment of the Development Fee specified in Section 6.1 hereof.

3.5  Delivery of Capital Note.  The obligation of the Limited Partner to pay the Second Installment of its Capital Contribution shall be evidenced by the delivery by the Limited Partner of the Capital Note, in substantially the form of Exhibit B attached hereto. After the Second Installment of its Capital Contribution has been paid by the Limited Partner and all other amounts, if any, due under the Capital Note and this Agreement have been paid, its Capital Note will be returned to it, marked "paid in full".

3.6  Treatment of Other Advances.  If any Partner shall advance funds to the Partnership other than the amount of its Capital Contribution, the amount of such advance shall not be considered a contribution to the capital of the Partnership, but shall be deemed either an Operating Loan or a Voluntary Loan and shall be subject to the provisions of Section 4.4 hereof.

3.7  Capital Accounts; No Interest; Withdrawal.  No Partner shall have the right to demand a return of his Capital Contribution, except as otherwise provided in this Agreement. No Partner shall have priority over any other Partner, either as to return of its Capital Contribution or as to profits, losses or distributions, except as otherwise specifically provided herein. Moreover, except for any claim of rescission by reason of breach under the Contribution Agreement and except as provided in the Development Deficit Guaranty Agreement, no General Partner shall be personally liable for the return of the Capital Contribution of any Limited Partner, or any portion thereof, it being expressly understood that any such return shall be made solely from assets of the Partnership, nor shall any General Partner be required to pay the Partnership or any Partner any deficit in its or any other Partner's Capital Account upon dissolution or otherwise, it being understood and agreed that any deficit in any Capital Account shall not be treated as an asset of the Partnership. Further, neither any Limited Partner nor any Special Limited Partner shall be required to pay to the Partnership any deficit in its Capital Account upon dissolution or otherwise, except as provided by law, with respect to third-party creditors of the Partnership; provided, however, that if the Special Limited Partner has a deficit balance in its Capital Account following the liquidation of its Interest, as determined after taking into account all adjustments to its Capital Account for the taxable year of the Partnership during which such liquidation occurs, the Special Limited Partner is unconditionally obligated to

24

restore the amount of such deficit balance to the Partnership by the end of such taxable year, or, if later, within 90 days after the date of such liquidation. No interest shall be paid on any Capital Account or Capital Contribution. No Partner shall have the right to demand or receive property other than cash for its Interest. Each of the Partners does hereby agree to, and does hereby, waive any right such Partner may otherwise have to cause any asset of the Partnership to be partitioned or to file a complaint or institute any proceeding at law or in equity seeking to have any such asset partitioned. No Partner shall be entitled to any return of capital or distribution, upon withdrawal or otherwise, except as expressly set forth in this Agreement, the Contribution Agreement or the Development Deficit Guaranty Agreement.

       3.8 <u>Liability of Limited Partners</u>. Neither any Special Limited Partner nor any Limited Partner shall be liable for any debts, liabilities, contracts or obligations of the Partnership, except as provided by law. Subject to Section 3.7 hereof, the Limited Partner and the Special Limited Partner shall be liable only to make payments of their Capital Contributions as and when due under this Agreement.

       3.9 <u>Provision of Other Amounts</u>. The Partners acknowledge that, pursuant to the Contribution Agreement and the exhibits thereto, the General Partners are obligated to indemnify the Partnership against any and all liability in respect of any and all transfer, gains, income, sales or other taxes and transfer fees of any kind imposed or asserted with respect to the acquisition by the Investor Limited Partners of their Interests. Such amounts shall not be deemed to be either a capital contribution or a loan from the General Partner, neither the Partnership nor any Investor Limited Partner shall be under any obligation to repay any such amount provided by the General Partner, and the provision of such amounts shall not affect the allocations and distributions provided for in Article IX hereof in any way whatsoever.

25

## ARTICLE IV

### COMPLIANCE WITH AUTHORITY REQUIREMENTS; PARTNERSHIP BORROWINGS

4.1  Authority Requirements.

A.  During the Compliance Period, the following provisions shall apply: (i) each of the provisions of this Agreement shall be subject to, and the General Partners covenant to act in accordance with, the Credit Conditions and all applicable Federal, state and local laws and regulations; (ii) the Credit Conditions and all such laws and regulations, as amended or supplemented, shall govern the rights and obligations of the Partners, their heirs, executors, administrators, successor and assigns, and they shall control as to any terms in this Agreement which are inconsistent therewith, and any such inconsistent terms in this Agreement shall be unenforceable by or against any of the Partners; (iii) upon any dissolution of the Partnership or any transfer of the Apartment Complex, no title or right to the possession and control of the Apartment Complex and no right to collect rent therefrom shall pass to any Person who is not, or does not become, bound by the Credit Conditions in a manner that, in the opinion of counsel to the Partnership, would not adversely affect the ability of the owner(s) of the Apartment Complex to utilize the Credits or avoid a recapture thereof; and (iv) any conveyance or transfer of title to all or any portion of the Apartment Complex required or permitted under this Agreement shall in all respects be subject to the Credit Conditions and all conditions, approvals or other requirements of the rules and regulations of any Authority applicable thereto.

B.  [Intentionally Omitted].

4.2  Authorization to the General Partners.

A.  Without in any way limiting the right or authority of the General Partners under this Article IV or Article V hereof, the General Partners are specifically authorized to execute all documents required by any Authority or any Lender in connection with the acquisition, construction or financing of the Apartment Complex; provided that the terms and conditions of the related Governmental Agreement and/or Mortgage and Mortgage Note were accurately and completely disclosed to the Limited Partner as set forth in the Contribution Agreement or such requirement arises out of an amendment to such Governmental Agreement, Mortgage or Mortgage Note made with the Consent of the Special Limited Partner.  Further, notwithstanding any other provision in this Agreement, the General Partners are hereby authorized to amend this Agreement without the consent of the Limited Partner or the Special Limited Partner to effectuate any amendments required by any Authority or any Lender pursuant to applicable law and/or the terms and conditions of a Governmental Agreement and/or Mortgage and Mortgage Note, the terms and conditions whereof were accurately and completely disclosed to the Limited Partner pursuant to the Contribution Agreement or such requirement arises out of an amendment to such Governmental Agreement, Mortgage or Mortgage Note made with the Consent of the Special Limited Partner.  The General

26

Partners may exercise the power of attorney granted in Section 15.2 hereof to effect the provisions of this Section 4.2.A.

B.  The General Partners shall, at no time, do or cause to be done any act directly or indirectly affecting the Apartment Complex except pursuant to the requiremhents of each Authority and each Lender, or, if such approval is required, with the prior approval thereof.

4.3  Right to Mortgage.

A.  The Partnership has obtained financing for the Apartment Complex from the Lender and has secured the same by the Mortgage.  Each and every Mortgage provides and shall continue to provide that no Person, including, but not limited to, the Partnership, any party holding a partnership interest in the Partnership, or any of their Affiliates, shall have any personal liability for the payment of all or any part of such Mortgage.

B.  The execution by the General Partners on behalf of the Partnership of the Project Documents is hereby ratified provided that the terms and conditions thereof were accurately and completely disclosed to the Limited Partner pursuant to the Contributions Agreement.

C.  The General Partners may modify, refinance or repay the Mortgage with the approval of each Lender and each Authority, if required, including any required transfer or conveyance of Partnership assets for security or mortgage purposes; provided, however, that the terms of any such modification, refinancing or repayment must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership.

4.4  Loans.  All borrowings by the Partnership shall be subject to the terms of this Agreement, the Project Documents and applicable rules, regulations and directives of any Authority, provided however, that the rights of the Lender shall not be subordinate to this Agreement.  To the extent borrowings are permitted, they may be made from any source, including any Partner or an Affiliate thereof; provided, however, that any borrowings from the General Partners or their Affiliates shall require the Consent of the Special Limited Partner.  Except as may be otherwise specifically set forth in this Agreement, if any Partner or Affiliate thereof shall lend any monies to the Partnership, such loan shall be unsecured and the amount of any such loan shall not be an increase of such Partner's Capital Contribution nor affect in any way such Partner's share of the profits and losses or distributions of the Partnership.  Any loan by a Partner or its Affiliate, other than an Operating Loan, shall be a Voluntary Loan, shall bear interest per annum at a rate equal to two percent in excess of the Prime Rate (but not in excess of the lawful maximum rate) and shall be repayable as set forth in Article IX hereof (to the extent permitted by each Authority); provided, however, that any Voluntary Loan shall be made solely for the benefit of the Partnership.  No Voluntary Loans by the General Partners or their Affiliates may be made to the Partnership during the time that the Guarantor is obligated to make Operating Loans to the Partnership.

27

## ARTICLE V

## RIGHTS, POWERS AND OBLIGATIONS OF THE
## GENERAL PARTNERS AND LIMITATIONS THEREON

5.1 Exercise of Management.

A. The overall management and control of the business, assets and affairs of the Partnership shall be vested in the General Partners and, subject to the specific limitations and restrictions set forth in this Article V and in Article IV hereof, the General Partners, in extension of and not in limitation of the powers given them by law, shall have full, exclusive and complete charge of the management of the business of the Partnership in accordance with its purpose stated in Section 2.5 hereof. Neither any Special Limited Partner nor any Limited Partner shall take part in the management or control of the business of the Partnership or have authority to bind the Partnership; provided, however, that the Special Limited Partner may exercise any and all of the rights granted to it under this Agreement.

B. The Managing General Partner (if at the time more than one Person constitutes the Managing General Partner) shall act by vote of a majority in interest of the Persons constituting the Managing General Partner, except where otherwise specified herein. If at any time there is no Managing General Partner, the General Partners shall act by vote of a majority in interest of the General Partners, except where otherwise specified herein.

C. Any General Partner, to the extent of its authorization, may from time to time, by an instrument in writing delegate all or any of its powers or duties hereunder to another General Partner. Such writing shall fully authorize such other General Partner to act alone without requirement of any other act or signature of the delegating General Partner, to take any action of any type and to do anything and everything which the delegating General Partner may be authorized to take or do hereunder except insofar as said delegation may be limited to certain acts or activities; provided, however, that any such delegation shall not relieve the delegating General Partner of his obligations or liabilities under this Agreement.

D. Each obligation of the General Partners under this Agreement shall be the joint and several obligation of each General Partner and each such obligation shall survive any withdrawal of a General Partner pursuant to Article XI hereof.

5.2 Duties and Authority of General Partners.

A. The General Partners shall devote to the Partnership such time as may be necessary for the proper performance of the duties of the General Partners. The General Partners shall at all times exercise their responsibilities as General Partners in a fiduciary manner. The signature of a General Partner shall be needed on any instrument, document or agreement to bind the Partnership, and third parties may rely fully on any such instrument, document or agreement signed by a General

28

Partner. Subject to the terms and conditions hereof, the General Partners shall be obligated, and are hereby authorized and directed, to:

(i)  Take all action that may be necessary or appropriate to carry out the purposes of the Partnership as described in this Agreement;

(ii)  Make inspections of the Apartment Complex and assure that the Apartment Complex is being properly maintained in accordance therewith and necessary repairs are being made;

(iii)  Prepare or cause to be prepared in conformity with good business practice all reports that are to be furnished to the Partners or that are required by taxing bodies or other governmental agencies, including operations reports of the Apartment Complex or by or on behalf of the General Partners, and the financial statements and reports referred to in Section 7.3 hereof;

(iv)  Cause the property of the Partnership at all times to be insured in a manner similar to other property of like kind in the same locality and in such amounts and on such terms as will fully(to the extent commercially available) and adequately protect the Partnership (provided that such insurance must be in an amount at least sufficient to satisfy the provisions of Section 5.12 hereof);

(v)  Obtain and maintain in force or cause to be obtained and maintained in force Worker's Compensation Insurance and such other insurance as may be required by applicable law or governmental regulation;

(vi)  Obtain and maintain in force or cause to be obtained and maintained in force adequate public liability insurance;

(vii) Comply with any rehabilitation budget or construction budget delivered pursuant to the Contribution Agreement;

(viii)  Enforce compliance with the Construction Contract and any other construction agreements;

(ix)  Comply with all Governmental Agreements;

(x)  Promptly report to the Investor Limited Partners any (a) material variance from the qualification standards for Credits or (b) failure to comply with the Governmental Agreements which would give rise to any event specified in Section 11.4.A(ii)(a) hereof; and

(xi)  Do all other things (subject to the restrictions contained herein) that may be necessary or desirable in order properly and efficiently to administer and carry on the affairs, assets and business of the Partnership, including, but not limited to, the execution of all conveyances, deeds, notes, mortgages or other documents.

29

B.  The General Partners shall operate the Apartment Complex and shall cause the Management Agent to manage the Apartment Complex in such a manner that the Apartment Complex will be eligible to receive a Credit with respect to 100% of the apartment units in the Apartment Complex.  To that end, the General Partners agree, without limitation, to make all elections requested by the Special Limited Partner under Section 42 of the Code to allow the Partnership or its Partners to claim the Credit, to file Form 8609 with respect to the Apartment Complex as required, for at least the duration of the Compliance Period to operate the Apartment Complex and cause the Management Agent to manage the Apartment Complex so as to comply with the requirements of Section 42(g) and (i)(3) of the Code, and shall make all certifications required by Section 42(1) of the Code.  The General Partners shall also make all filings and all elections requested by the Special Limited Partner to allow the Partnership or its Partners to depreciate the Apartment Complex using the straight-line method of depreciation over a recovery period determined under Section 168(c) of the Code.

C.  The General Partners agree that they shall prepare or cause to be prepared an annual budget in connection with the operations of the Apartment Complex for each succeeding Fiscal Year of the Partnership and shall deliver the same to the Special Limited Partner not later than November 1 of the Fiscal Year preceding the Fiscal Year to which such budget relates.  Each such budget shall contain an amount to be added to separate reserves for payment of real estate taxes, insurance and replacements in an amount with respect to each such reserve equal to the greater of (i) the amount required to be added to such reserve during such year by any Lender or (ii) the amount that is reasonable in the circumstances, which, in the case of the reserve for replacements, shall not be less than $616.67 per month.   Such budget shall not be adopted until the Special Limited Partner shall have approved the same in writing.  Notwithstanding anything to the contrary contained herein, the Partnership shall not make any expenditure of funds, or commit to make any such expenditure, other than in response to an emergency, except as provided for in an annual budget so approved by the Special Limited Partner.

D.  The General Partner shall cause the Partnership to deposit into a reserve for replacements each month starting with the month following the payment of the Fourth Installment the amount of $616.67 per month, less such amount as shall be required to be set aside (and is actually set aside) for such purpose by any Lender (the "Mandatory Reserve"); provided, however, that in the event that with respect to any month after the termination of the Guaranty Period and prior to the end of the Compliance Period the Partnership does not have Cash Flow (as determined prior to any reduction for amounts allocated to reserves) available to make the required deposit in the Mandatory Reserve, the Guarantor shall, pursuant to and subject to the limitations contained in the Replacement Reserve Guaranty Agreement, make such deposit on behalf of the Partnership as an Operating Loan repayable pursuant to Article IX hereof.  Any interest earned on the reserve for replacements shall become a part of that reserve.   Anything to the contrary contained in Section 7.1 hereof notwithstanding, the reserve for replacements shall be maintained in the name of the Partnership in an account with a bank acceptable to the Special Limited Partner, and withdrawals from such account shall require the approval of the Special Limited Partner.  The General Partner shall cause the

30

W247361.4

Partnership to deliver to the Special Limited Partner a copy of the monthly statements received with respect to that account.

      E.      The General Partner, and not the Developer, shall be solely responsible for the following:

      (i)      analyzing the qualified allocation plan for targeted areas within the State;

      (ii)      identifying potential land sites and analyzing the demographics of potential sites;

      (iii)      analyzing the economy and forecasting future growth potential of the geographic area in which the Apartment Complex is located;

      (iv)      determining the Land's zoning status and possible rezoning strategies;

      (v)      Contacting local government officials concerning access to utilities, public transportation, impact fees and local ordinances;

      (vi)      performing environmental tests on the Land (except to the extent that the Developer is responsible for such tests on any buildings or Land immediately below the buildings);

      (vii)      negotiating the purchase of the Land and its related financing;

      (viii)      causing the Partnership to acquire the Land;

      (ix)      processing necessary documentation with the Agency in connection with Tax Credits;

      (x)      arranging the permanent Mortgage Loan for the Partnership; and

      (xi)      arranging for the admission to the Partnership of the Investor Limited Partners.

      In consideration for its services set forth in this Section 5.2, the General Partner has received its interests in distributions of the Partnership's Net Cash Flow and of the proceeds from sale and liquidation of Partnership property as set forth in Sections 10.1 and 10.2. The General Partner shall not assign or delegate any of these duties to the Developer. The General Partner shall not perform any duties which are specifically assigned to the Developer pursuant to the development agreement entered into by and between the Partnership and the Developer.

      F.      The General Partner shall cause the Partnership to deposit $55,000 into a reserve (the "Transition Reserve"), to be used to cover operating shortfalls in the event that at any time during the Compliance Period funds are not appropriated under the Partnership's Section 8 Housing Assistance Payment Contract. The Transition Reserve shall be funded from a portion of the

31

W247361.4

Limited Partner's Fourth Installment; provided, however, that in the event that as a result of the adjusters set forth in Section 3.4.A hereof, the Fourth Installment is insufficient to make the required deposit into the Transition Reserve, the Guarantor shall make such deposit on behalf of the Partnership. Any interest earned on the Transition Reserve shall become a part of that reserve. The Transition Reserve shall be maintained in the name of the Partnership in an account with a bank acceptable to the Special Limited Partner until the end of the Compliance Period, and withdrawals from such account shall require the Consent of the Special Limited Partner. The General Partner shall cause the Partnership to deliver to the Special Limited Partner a copy of the monthly statements received with respect to that account. At the end of the Compliance Period, any funds remaining in the Transition Reserve shall become the property of the Partnership.

5.3  Delegation of General Partners Authority; Tax Matters Partner.

A. The General Partners hereby delegate all their powers and duties hereunder to the Managing General Partner. For all purposes of this Agreement, including, without limitation, the delivery of certificates and the granting or withholding of all consents and approvals, the Managing General Partner shall have the sole right to act in the name of and on behalf of the General Partners. Subject to the terms and conditions hereof, the Managing General Partner is hereby fully authorized, without the requirement of any act or signature of the other General Partners, to take any action of any type and to do anything and everything which a general partner of a limited partnership organized under the Uniform Act may be authorized to take or do thereunder, and specifically, without limitation of such authority, to execute, sign, seal and deliver in the name and on behalf of the Partnership:

(i)  any note, mortgage or other instrument or document in connection with the Mortgage, the Mortgage Note or any Governmental Agreement, and all other agreements, contracts, certificates, instruments or documents required by any Authority and/or any Lender in connection therewith or with the acquisition, development, construction, improvement, operation or leasing of the Apartment Complex or otherwise required by any Authority and/or any Lender under the Project Documents in connection with the Apartment Complex;

(ii)  any deed, lease, mortgage, mortgage note, bill of sale, contract or any other instrument purporting to convey or encumber the real or personal property of the Partnership;

(iii)  any rent supplement or leasing or other contract or agreement providing for public or non-public financial assistance, directly or indirectly, to tenants of the Apartment Complex;

(iv)  any and all agreements, contracts, documents, certificates and instruments whatsoever involving the acquisition, development, construction, improvement, management, maintenance, leasing and operation of the Apartment Complex, including the employment of such Persons as may be necessary therefor; and

(v)  any and all instruments, agreements, contracts, certificates or documents

32

W247361.4

requisite to carrying out the intention and purpose of this Agreement, including, without limitation, the filing of all business certificates, this Agreement and all amendments thereto, and documents required pursuant to the Project Documents or by any Authority and/or any Lender or deemed advisable by the Managing General Partner in connection with any financing.

B.  Every contract, agreement, certificate, document or other instrument executed by the Managing General Partner shall be conclusive evidence in favor of every person relying thereon or claiming thereunder that, at the time of the delivery thereof, (i) the Partnership was in existence, (ii) this Agreement had not been terminated or cancelled or amended in any manner so as to restrict such authority (except as shown in any instrument duly filed in the Filing Office) and (iii) the execution and delivery thereof was duly authorized by the General Partners.  Any Person dealing with the Partnership or the Managing General Partner may always rely on a certificate signed by the Managing General Partner hereunder:

(a)  as to who are the Partners hereunder;

(b)  as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by any General Partner or are in any other manner germane to the affairs of the Partnership;

(c)  as to who is authorized to execute and deliver any instrument, contract, agreement, certificate or document for the Partnership;

(d)  as to the authenticity of any copy of this Agreement and amendments thereto; or

(e)  as to any act or failure to act by the Partnership or as to any other matter whatsoever involving the Partnership or the Apartment Complex.

C.  The Partners hereby consent to the exercise by the Managing General Partner of the powers conferred on it by this Agreement.

D.  All of the Partners hereby agree that Francoeur Senior Housing, LLC shall be the "Tax Matters Partner" pursuant to the Code and in connection with any audit of the Federal income tax returns of the Partnership; provided, however, that if the Managing General Partner shall withdraw from the Partnership, become Bankrupt or be dissolved, the Special Limited Partner or any other General Partner designated by the Special Limited Partner shall thereafter be the "Tax Matters Partner.  So long as a General Partner is the Tax Matters Partner, in discharging its duties and responsibilities, it shall act as a fiduciary to the Limited Partner and shall obtain the Consent of the Special Limited Partner, which Consent shall not be unreasonably withheld or delayed, in connection with all material decisions and determinations to be made by the Partnership with respect to income tax matters including decisions to be made in each administrative and judicial proceeding in which the Partnership is a party and all elections to be made by the Partnership in connection therewith.

W247361.4

E. So long as a General Partner is the Tax Matters Partner, the Special Limited Partner shall have the right to determine to litigate any administrative determination relating to Federal income tax matters, and shall have the right to litigate such matter in such court and to settle such matters as the Special Limited Partner shall decide in its sole discretion, provided, however, that if the settlement of any such matter would require the General Partner to make any payments or result in any reallocation of Cash Flow under Section 10.1 or Sale or Refinancing Proceeds under Section 10.2.(an "Adjustment Event"), such settlement shall require the consent of the General Partner which consent shall not be unreasonably withheld. Notwithstanding the foregoing, if there is any litigation which would, if unfavorably determined, result in an Adjustment Event or require the payment of any amounts under the Recapture Guaranty Agreement and the General Partner provides reasonable assurances to the Special Limited Partner that it has the ability to pay any costs or damages of such litigation and acknowledges its liability in the event of an unfavorable determination, the Special Limited Partner agrees (i) not to exercise its right to settle such litigation and (ii) to allow the General Partner to control the course of such litigation at its own expense, with counsel reasonably satisfactory to the Special Limited Partner, including negotiation and settlement of such litigation, provided the Special Limited Partner shall have the right to reasonably consent to the any settlement of such litigation.

5.4  Lease, Conveyance or Refinancing of Assets of the Partnership.

A.  Except as may be otherwise expressly provided in Section 4.1 hereof and elsewhere in this Agreement, the General Partners, with the approval of each Authority (if required), are hereby authorized to sell, lease, exchange, refinance or otherwise transfer, convey or encumber all or substantially all of the assets of the Partnership; provided, however, that the terms of any such sale, exchange, refinancing or other transfer, conveyance or encumbrance must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership. Notwithstanding the foregoing, no such consent shall be required for the leasing of apartments to tenants in the normal course of operations, the leasing of all or substantially all of the apartments to a public housing authority at rents satisfactory to each Authority or leases or concessions related to the operation of the Apartment Complex. The General Partner shall not sub-lease any commercial space in the Apartment Complex without the prior Consent of the Special Limited Partner.

B.  Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 5.4.B shall apply if, in order to claim Credits with respect to the Apartment Complex, the Partnership is required by applicable law or any Project Document to comply with the procedure specified in the next sentence as a condition of the right of the Partnership to dispose of the Apartment Complex free of the restrictions imposed thereby to continue to lease apartment units to low-income tenants (as defined in such law or document). The Special Limited Partner shall have the right at any time after the beginning of the last year of the Compliance Period to require, by written notice to the General Partners, that the General Partners promptly submit a written request to the applicable state housing credit agency pursuant to Section 42(h)(6)(I) of the Code that such agency endeavor to locate within one year from the date of such written request a purchaser for the

34

Apartment Complex who will continue to operate the Apartment Complex as a qualified low income property, at a purchase price that is not less than the sum of (a) the outstanding balance of all Mortgage Notes plus (b) the Partnership's equity in the Apartment Complex (adjusted for cost of living increases as permitted by Section 42(h)(6)(G) of the Code). In the event that the state housing credit agency obtains an offer satisfying the conditions of the preceding sentence, the General Partners shall promptly notify the Special Limited Partner in writing with respect to the terms and conditions of such offer, and, if the Special Limited Partner notifies the General Partners that such offer should be accepted, the General Partners shall cause the Partnership promptly to accept such offer and to proceed to sell the Apartment Complex pursuant to such offer.

       C.  (i)  Subject to the provisions of Sections 5.4.B and 5.4.D hereof, but notwith-standing any other provision of this Agreement to the contrary, the Special Limited Partner shall have the right at any time after the end of the period in which the General Partner has the right to exercise its option to purchase the Apartment Complex, to require, by written notice to the General Partners (the "Required Sale Notice"), that the General Partners promptly use their commercially reasonable efforts to obtain a buyer for the Apartment Complex on the most favorable terms then obtainable. The General Partners shall submit the terms of any proposed sale to the Special Limited Partner for its approval as provided in Section 5.4.A hereof. If the General Partners shall fail to so obtain a buyer for the Apartment Complex within six months of the Required Sale Notice or if the Special Limited Partner in its sole discretion shall withhold its consent to any proposed sale to such buyer, then the Special Limited Partner shall have the right at any time thereafter to obtain a buyer for the Apartment Complex on terms acceptable to the Special Limited Partner (but not less favorable to the Partnership than any proposed sale previously rejected by the Special Limited Partner).   In the event that the Special Limited Partner so obtains a buyer, it shall notify the General Partner in writing with respect to the terms and conditions of the proposed sale and the General Partner shall cause the Partnership promptly to sell the Apartment Complex to such buyer or the General Partner shall have the right exercisable upon sixty days notice of receipt of the offer of such buyer, to purchase the Apartment Complex on the same terms and conditions as such offer, in which event the General Partner shall purchase the Apartment Complex within 120 days following its exercise of such right on the terms and conditions set forth in the offer. Any sale under this Section 5.4.C shall be made subject to any other then existing rights of tenants under applicable law. Notwithstanding the foregoing, upon the receipt of any such offer, the General Partner shall have the right to object to any such sale if the net proceeds from such sale would be insufficient to return to the General Partner all of its Capital Contributions (including any amount required to be paid upon such sale) and pay any federal and state taxes owed by the General Partner as a result of such sale, or on the grounds that the purchase price for the Apartment Complex is below the fair market value of the Apartment Complex (taking into account the burdens of any restrictions imposed by the Authority and any benefits of any below market financing encumbering the Property). In such event, the General Partner shall not be required to sell the Apartment Complex on the terms of such offer or any subsequent offer presented by the Special Limited Partner unless its purchase price is at least equal to the fair market value. If there is a dispute as to fair market value, then such value shall be determined by appraisal, as follows:

       (a) The Special Limited Partner shall select an independent real estate appraiser

35

and the General Partner shall select another independent real estate appraiser within 30 days after the need for such appraisal arises. If either party fails to appoint a real estate appraiser within ten days after the other party has given notice of the name of its real estate appraiser, the single real estate appraiser appointed shall be the sole appraiser and shall establish the fair market value of the Partnership's assets. If the two real estate appraisers are appointed by the parties as above provided, they shall meet promptly and attempt to establish the fair market value of the Apartment Complex;

(b) The fair market value of the Apartment Complex shall be the average of the appraisals rendered by each of the two real estate appraisers so selected; provided, however, that if one of the appraisals so rendered shall reflect a fair market value that is more than 10% greater or more than 10% less than the other appraisal so rendered, the two real estate appraisers shall promptly select a third independent real estate appraiser (or, if such real estate appraisers cannot agree on the selection of a third independent real estate appraiser, the third real estate appraiser shall be selected by (i) the senior (in terms of service) judge of the United States District Court located in Burlington, Vermont or (ii) the President of the Vermont Chapter of the American Arbitration Association upon application by either the Special Limited Partner or the General Partner), which real estate appraiser shall establish fair market value hereunder by designating the appraisal of the real estate appraiser of the Special Limited Partner or the General Partner as fair market value;

(c) Any real estate appraiser engaged to render an appraisal hereunder must be experienced in valuing real estate such as the Apartment Complex. The appraisers shall take into account in determining the fair market value of the Apartment Complex the continuing existence of any restrictions on rents and income of the residents as set forth in any Project Documents or Regulatory Agreements. Each party will bear the expenses of its own real estate appraiser, and the Special Limited Partner shall bear 50% and the General Partner shall bear 50% of the expenses incurred in engaging a third real estate appraiser.

(ii) A sale of the Apartment Complex prior to the end of the Compliance Period may only take place if the conditions of Section 42(j)(6) of the Code will be satisfied upon such sale either (a) by having the purchaser of the Apartment Complex post the required bond on behalf of the Partnership or (b) with the Consent of the Special Limited Partner, having the Partnership post such bond.

D.  FSHLLC, so long as it is a General Partner, shall have an option to purchase the Apartment Complex or to purchase the Investor Limited Partners' Interests, which option shall be exercisable for a period of two years after the conclusion of the "compliance period" (as defined in Section 42(i) of the Code) with respect to the Apartment Complex. In the event that the General Partner exercises its option to purchase the Apartment Complex, the purchase price shall be equal to the greater of (i) the fair market value of the Apartment Complex or (ii) the sum of (A) the amount of the outstanding mortgage indebtedness secured by the Apartment Complex (which indebtedness may be assumed by the General Partner at its discretion and with the approval of the Lender), plus (B) the amount of federal, state and local tax liability that the Partners would incur as a result of such sale,

36

plus (C) the amount by which the Credits actually allocated to the Limited Partner is less than the total Credits expected to be allocated to it as set forth in Section 3.2.B. The fair market value of the Apartment Complex shall be determined in the manner set forth in Section 5.4.C(i)(a) through (c). In the event that the General Partner exercises its option to purchase the Investor Limited Partner's Interests, then the amount to be paid to the Investor Limited Partners by the General Partner for their Interests shall equal the amount each such Investor Limited Partner would have received the Apartment Complex had been sold for the amount set forth above in this Section 5.4.D and the proceeds were distributed in the manner set forth in Section 10.2.

     5.5   Restrictions on Authority. Notwithstanding any other provisions of this Agreement:

     A. No General Partner shall have authority to perform any act in violation of any applicable laws or regulations, the Project Documents or any agreement between the Partnership and any Authority or any Lender, or to take any action which under the Uniform Act or this Agreement requires the approval, ratification or consent of some or all of the Partners without first obtaining such approval, ratification or consent, as the case may be.

     B. The General Partners shall not have authority to do any of the following acts, except with the Consent of the Special Limited Partner and the approval, to the extent required, of any Authority and any Lender:

     (i) acquire any real or personal property (tangible or intangible) in addition to the Apartment Complex the aggregate value of which shall exceed $10,000 (other than easements or similar rights necessary or appropriate for the operation of the Apartment Complex, items set forth in the budget approved pursuant to Section 5.2.C or items paid from reserve for replacements funds released with the approval of the Lender) and Special Limited Partner;

     (ii) become personally liable on or in respect of, or guarantee, a Mortgage Note or a Mortgage or any other indebtedness of the Partnership, except for trade vendor debt incurred in the normal course of the Partnership's business;

     (iii) pay any salary, fees or other compensation to a General Partner or any Affiliate thereof, except as authorized by Section 5.7 or Articles VI and VIII hereof or specifically provided for in this Agreement;

     (iv) sell all or any portion of the Apartment Complex or modify or refinance the Mortgage or incur any indebtedness for borrowed money except as specifically provided in this Agreement and subject to the provisions contained in Section 5.4 hereof;

     (v) terminate the services of the Accountants, the Architect, the Contractor or the Management Agent, or terminate, amend or modify the Construction Contract or any other

37

W247361.4

Project Document or grant any material waiver or consent thereunder;

(vi) engage a substitute Management Agent or approve the delegation by the Management Agent of all or a substantial portion of its duties to a third party;

(vii) amend or terminate the Operating Deficit Guaranty Agreement or any of the Other Guarantees, or grant any waiver or consent thereunder;

(viii) cause the Partnership to redeem or repurchase all or any portion of the Interest of a Partner;

(ix) accept additional Capital Contributions other than those expressly provided for in this Agreement;

(x) admit additional General Partners or Limited Partners to the Partnership except in accordance with the express terms hereof;

(xi) cause the Partnership to convert the Apartment Complex to cooperative or condominium ownership;

(xii) cause or permit the Partnership to be merged with any other entity;

(xiii) cause or permit the Partnership to make loans to the General Partner or any Affiliate;

(xiv)    grant any waivers or consents under any Project Documents; or

(xv) cause or permit the Partnership to take or omit or suffer any action that would result in a recapture of Credits previously recognized by the Partnership or a reduction or disallowance of any Credits anticipated to be recognized by the Partnership as contemplated by Section 3.4.B hereof, other than an Unavoidable Event.

The enumeration of the foregoing rights shall not diminish or affect the existence or exercise of other rights expressly granted to the Special Limited Partner elsewhere herein.

5.6  Activities of Partners. It is understood that each General Partner is and will be engaged in other activities and occupations unrelated to the Partnership, and each General Partner shall be required to devote only so much of its time as it in its sole discretion may deem necessary to the affairs of the Partnership. Any Partner may engage in and have an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operating, construction, rehabilitation, renovation, improvement, management and development of real property whether or not such real property is directly or

38

W247361.4

indirectly in competition with the Apartment Complex; provided, however, that nothing herein shall be construed to relieve a General Partner of any of its fiduciary obligations with respect to the management of the Apartment Complex. Neither the Partnership nor any other Partner shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, regardless of the location of such real property and whether or not such venture was presented to such Partner as a direct or indirect result of his connection with the Partnership or the Apartment Complex.

5.7 Dealing with Affiliates. Subject to the restrictions contained in this Agreement, the General Partners may, for, in the name and on behalf of, the Partnership, enter into agreements or contracts for performance of services for the Partnership as an independent contractor with a General Partner or an Affiliate thereof and the General Partners may obligate the Partnership to pay compensation for and on account of any such services; provided, however, that unless the terms of such compensation and/or services are specified in this Agreement, (A) such compensation and services shall be on terms not less favorable to the Partnership than if such compensation and services were paid to and/or performed by a person who was not a General Partner or an Affiliate thereof and (B) after full and accurate disclosure to the Special Limited Partner of the interest of the General Partners, the Consent of the Special Limited Partner to the provision of such services by such Affiliate shall have been obtained.

5.8 Indemnification and Liability of the General Partners.

A. To the maximum extent permitted by law, the Partnership, its receiver or its trustee, shall indemnify and hold harmless the General Partners and their Affiliates from and against any liability, loss or damage incurred by them by reason of any act performed or omitted to be performed by them, including costs and reasonable attorneys' fees (which attorneys' fees may be paid as incurred) and any amount expended in the settlement of any claim of liability, loss or damage; provided, however, that (i) if such liability, loss or damage arises out of any action or inaction of any Affiliate, such action or inaction must have occurred while such party was engaged in activities which could have been engaged in by a General Partner in its capacity as such; (ii) if such liability, loss or damage arises out of any action or inaction of the General Partners or their Affiliates, (a) the General Partners or their Affiliates must have determined, in good faith, that such course of conduct was in the best interests of the Partnership and (b) such course of conduct did not constitute fraud, negligence or misconduct by the General Partners or their Affiliates; and (iii) any such indemnification shall be recoverable only from the assets of the Partnership and not from the assets of any Partner. All judgments against the Partnership and the General Partners or their Affiliates, wherein the General Partners or their Affiliates are entitled to indemnification, must first be satisfied from Partnership assets before such General Partners or their Affiliates are responsible for these obligations. The Partnership shall not pay for any insurance covering liability of the General Partners or their Affiliates for actions or omissions for which indemnification is not permitted hereunder; provided, however, that nothing contained herein shall preclude the Partnership from purchasing and paying for such types of insurance, including extended coverage liability and casualty and workers' compensation, as would be customary for any person owning comparable assets and engaged in a similar business, or

39

from naming the General Partners or their Affiliates as additional insured parties thereunder, if such addition does not add to the premiums payable by the Partnership. Nothing contained herein shall constitute a waiver by any Investor Limited Partner of any right which it may have against any party under Federal or state securities laws nor shall an Investor Limited Partner be permitted to contract away the fiduciary duty owed to it by the General Partners or their Affiliates under common law. The provision of advances from the Partnership to the General Partners or their Affiliates for legal expenses and other costs incurred as a result of a legal action is permissible if the following three conditions are satisfied: (I) The legal action relates to the performance of duties or services by General Partners or their Affiliates on behalf of the Partnership; (II) the legal action is initiated by a third party who is not an Investor Limited Partner of the Partnership; and (III) the General Partners or their Affiliates undertake to repay to the Partnership the funds so advanced in cases in which they would not be entitled to indemnification hereunder. Notwithstanding anything to the contrary contained herein, in no event shall any indemnity under this Section 5.8.A be applicable to any expenditures or obligations of any General Partner or Affiliate thereof which are the subject of a separate obligation or guaranty to the Partnership by such General Partner or such Affiliate thereof.

B. Notwithstanding the provisions of Section 5.8.A hereof, the General Partners and their Affiliates shall not be indemnified or held harmless pursuant to Section 5.8.A hereof from any liability, loss or damage incurred by them in connection with, and shall indemnify and hold harmless the Partnership and the other Partners from and against any liability, loss or damage incurred by them by reason of, (i) any liability imposed by law, including for fraud, negligence or misconduct; or (ii) any claim or settlement involving allegations that Federal or state securities laws associated with the offer and sale of an Interest were violated by the General Partners or their Affiliates unless: (a) the in-demnitee is successful in defending such action on the merits of each count involving securities laws violations and such indemnification is specifically approved by a court of competent jurisdiction; (b) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction and the court specifically approves such indemnification; or (c) a court of competent jurisdiction approves a settlement of the claims against the entity seeking indemnification involving securities law violations and finds that indemnification of the settlement and related costs should be made. Any person seeking indemnification shall apprise the court as to the current position of the Securities and Exchange Commission, the California Commissioner of Corporations, the Massachusetts Securities Division and other applicable state securities administrators regarding indemnification for violations of securities laws.

5.9 Representations and Warranties. Each General Partner hereby represents and warrants to each of the other Partners that the following are true and accurate as of the Admission Date and will be true and accurate on the due date of any payment of Capital Contributions to the Partnership:

A. The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken pertaining to the Partnership or the Apartment Complex by each General Partner which is a corporation or by each Affiliate of a General Partner which is a corporation have been or will be duly authorized by all necessary corporate or other action and the

40

W247361.4

consummation of any such transactions with or on behalf of the Partnership will not constitute a breach or violation of, or a default under, the charter or by-laws of such General Partner or such Affiliate or any agreement by which such General Partner or such Affiliate or any of its properties is bound, nor constitute a violation of any law, administrative regulation or court decree.

   B. No Bankruptcy has occurred with respect to any of the General Partners or any Affiliates thereof.

   C. As of the Admission Date all accounts of the Partnership required to be maintained under the terms of the Project Documents, including, without limitation, any account for replacement reserves, are currently funded to required levels, including levels required by any Authority.

   D. The General Partners have not lent or otherwise advanced any funds to the Partnership other than their Capital Contributions and the Partnership has no unsatisfied obligation to make any payments of any kind to the General Partners or any Affiliate thereof outstanding as of the Admission Date.

   E. No event has occurred which with the giving of notice, the passage of time or both would constitute a material default under any of the Project Documents.

   F. Each of the representations and warranties contained in the Contribution Agreement are true and correct on the date hereof as if made on and as of such date.

   G. The Partnership is acquiring the Capital Note without a view to the sale or distribution thereof and without any present intention of distributing or selling the same. The Partnership agrees that it (and any holder of any interest in the Capital Note) will not sell, assign or otherwise transfer its interest in the Capital Note (or any fraction thereof) without the Consent of the Special Limited Partner and unless such transfer shall be in full compliance with all applicable securities laws and regulations.

   H. The fees payable by the Partnership to the General Partner or its Affiliates are reasonable for the services actually provided.

   I. (i) All amounts included in the determination of "eligible basis" (as defined in Section 42(d) of the Code) as set forth in the development budget provided to the Limited Partner and in the application submitted to the Agency for Tax Credits, are properly includable pursuant to the Code and Internal Revenue Service rulings; (ii) the General Partner shall cause the Accountants to re-certify the eligible basis of the Apartment Complex in conjunction with the Partnership's application to the Agency for IRS Forms 8609 and in conjunction with the audited cost certification of eligible basis prepared in connection with the making of the Third Installment; (iii) the Accountants have certified that no portion of the Apartment Complex's eligible basis, including the portion of the Developer Fee included in eligible basis, is allocable, under the Code and rulings issued by the Internal Revenue Service, to land costs, organizational or syndication costs or impact fees imposed by any Authority; any land preparation costs

41

included in eligible basis are inextricably associated with depreciable assets of the Partnership; (iv) the Accountants have certified that any portion of the Developer Fee that is included in eligible basis, including any portion the payment of which is deferred, is properly includable in eligible basis under the Code and Internal Revenue Service rulings; (v) the General Partner shall provide to the Accountants and the Investor Limited Partners, promptly upon their request, such written documentation as is reasonably requested by the Accountants and Investor Partners in order to verify the determination of eligible basis, including documentation supporting the allocation of any costs incurred by the Partnership into the determination of eligible basis.

   5.10  Additional Covenants of General Partners.  The General Partners shall permit, and shall cause the Management Agent to permit, the Special Limited Partner and its representatives to have access to the Apartment Complex and personnel employed by the Partnership and by the Management Agent who are concerned with management of the Apartment Complex at all reasonable times during normal business hours and to examine all agreements and plans and specifications and shall deliver copies and such reports as may reasonably be required by the Special Limited Partner. The General Partners shall promptly provide the Special Limited Partner with copies of all correspondence, notices and reports sent pursuant to and received under the Project Documents with respect to any Lender or any Authority with respect to the Apartment Complex, together with copies of all other correspondence of substantial importance which a prudent investor would wish to examine in connection with the transaction.

   5.11  Obligation to Repair and Rebuild Apartment Complex.  With the approval of any Lender and any Authority, if such approval is required, any insurance proceeds received by the Partnership due to fire or other casualty affecting the Apartment Complex will be utilized to repair and rebuild the Apartment Complex in satisfaction of the conditions contained in Section 42(j)(4) of the Code and to the extent required by any Lender and any Authority.  Any such proceeds received in respect of such an event occurring after the Compliance Period shall be so utilized or, if permitted by the Project Documents and with the Consent of the Special Limited Partner, shall be treated as Sale or Refinancing Transaction Proceeds.

## ARTICLE VI

## CERTAIN PAYMENTS

  6.1  Development Fee.  As consideration for the services of the Developer to the Partnership in connection with the development of the Apartment Complex, the Partnership has paid or will pay the Developer a fee (the "Developer Fee") of up to $360,000, but not more than the amount allowed by the applicable Authority allocating Tax Credits, (which fee shall include any developer's overhead charged to the Apartment Complex) and shall be payable pursuant to the terms of the Development Agreement.  The Development Fee (other than, subject to the consent of the Lender, Developer's Overhead) shall be payable entirely out of Development Surplus after payment of all costs in

42

connection with the operation and Construction of the Apartment Complex through the Break-Even Date and to the extent that the Development Surplus actually received by the Project Partnership prior to the Break-Even Date is not sufficient to pay such fee in its entirety, the balance shall be deferred ("Deferred Development Fee"). Any Deferred Development Fee shall bear interest, compounded annually, commencing upon the date (the "Placed-In-Service Date") on which the Apartment Complex is placed in service (within the meaning of Section 42 of the Code) at the Long Term Applicable Federal Rate (as such term is defined in the Code) in effect on the Placed-In-Service Date. The entire outstanding principal balance of the Deferred Development Fee and accrued interest thereon shall be due in full on the 13th anniversary of Completion (the "Developer Fee Maturity Date"). Such Deferred Development Fee shall be payable out of Cash Flow or Sale or Refinancing Transaction Proceeds as provided in Sections 10.1(e) and 10.2(h) and, to the extent not otherwise needed to satisfy current obligations of the Partnership, from the proceeds of the Limited Partner's Capital Contributions payable following the Break-Even Date. If any or all of the Deferred Development Fee remains unpaid at the Developer Fee Maturity Date, the General Partner shall be obligated to contribute as capital such unpaid amount to the Partnership for payment thereof. If at any time, by reason of the limitations on allowable deductions contained in Section 267 or other similar provisions of the Code, deductions attributable to the Development Fee are not allowable, the General Partner shall be required to recognize in income such portion of the Deferred Development Fee as may be necessary for such deductions to be allowable in any year in which such deductions would have been allowed but for such limitations. Upon request of the Special Limited Partner, the General Partner shall cause the Developer to provide to the Investor Limited Partners such information as it shall request to confirm compliance with the preceding sentence. Notwithstanding anything herein or in the Development Agreement to the contrary, the Developer shall not provide any services to the Partnership which are identified in Section 5.2E.

6.2 Annual Local Administrative Fee. For its services in monitoring the operations of the Partnership, the Special Limited Partner shall receive an Annual Local Administrative Fee in the amount of $3,500 per annum beginning on the Admission Date which amount shall be increased annually on the anniversary of the Admission Date by three percent (3%) per annum, such amount to be payable only out of Cash Flow otherwise available for distribution pursuant to Section 10.1(e) hereof. Notwithstanding anything to the contrary contained herein, proceeds of Operating Loans shall not be used to pay the Annual Local Administrative Fee.

6.3 Supervisory Management Fee. For supervisory management services rendered, the Partnership shall pay FSHLLC for supervising the Management Agent an annual incentive supervisory management fee equal to 60% of the amount of Cash Flow otherwise distributable to the Partners pursuant to Section 10.1(h) hereof, provided however that such supervisory management fee shall not exceed an amount equal to seven percent (7%) of the gross rental income of the Partnership in any Fiscal Year and the sum of the supervisory management fee and management fee paid to the Management Agent under Article VIII shall not exceed an amount equal to thirteen and one-half percent (13.5%) of the gross rental income of the Partnership in any Fiscal Year.

43

ARTICLE VII

ACCOUNTING, REPORTS, BOOKS,
BANK ACCOUNTS AND FISCAL YEAR

7.1  Bank Accounts.  The bank accounts of the Partnership shall be maintained in such banking institutions authorized to do business in the State or such other states as permitted by each Authority and as the General Partners shall determine, and withdrawals shall be made on such signature or signatures as the General Partners shall determine.  The Partnership's funds shall not be commingled with the funds of any other Person and shall not be used except for the business of the Partnership.  All deposits (including security deposits and other funds required to be placed in escrow by any Authority or any Lender and other funds not needed in the operation of the Partnership's business) shall be deposited, to the extent permitted by each Authority, in interest-bearing accounts or invested in obligations of or guaranteed by the United States, any state thereof, or any agency, municipality or other political subdivision of any of the foregoing, commercial paper (investment grade), certificates of deposit and time deposits in commercial banks with capital in excess of $50,000,000 and in mutual (money market) funds investing in any or all of the foregoing; provided, however, that any funds required to be placed in escrow by any Authority or Lender shall be controlled by such Authority or Lender and the General Partners shall not be permitted to make any withdrawal from such funds without the express written consent of such Authority or Lender to the extent required.

7.2  Books of Account; Fiscal Year.  Complete and accurate books of account, in which shall be entered, fully and accurately, each and every transaction of the Partnership, shall be kept or caused to be kept by the General Partners.  The books shall be kept on an accrual basis of accounting, and the Fiscal Year of the Partnership shall be the calendar year.  All of the Partnership's books of account, together with an executed copy of this Agreement and copies of such other instruments as the General Partners may execute hereunder, including amendments thereto, shall at all times be kept at the principal office of the Partnership and shall be available during normal business hours for inspection by any Partner or his duly authorized representative or, at the expense of any Partner, for audit by him or his duly authorized representative.

7.3  Reports.

A.  Within 45 days after the end of each of the first three quarters of each Fiscal Year, the General Partners shall have prepared and shall deliver to the Investor Limited Partners, commencing with the first quarterly period ending after the Admission Date, (i) a balance sheet and statements of income (or loss) and changes in financial position and Cash Flow for, or as of the end of, such quarter in customary form and substance (or in such form and substance as the Special Limited Partner shall reasonably request so as to facilitate the Limited Partner's filings with the Securities and Exchange Commission and any other filings required by law), none of which need be audited unless required by law, together with a report of other pertinent information regarding the Partnership and its activities during such quarter, including, but not limited to, a statement of the amount of all fees and other compensation paid by the Partnership during such quarter to the General

44

Partners or any of their Affiliates, and (ii) a certificate of the General Partners that each of the apartment units in the Apartment Complex which is then occupied qualifies as a "low income unit" under Section 42 of the Code.

B.    The General Partners shall send to each Investor Limited Partner such tax information as shall be necessary for inclusion by each Investor Limited Partner in its Federal income tax returns and required state income tax and other tax returns.  The General Partners shall send this information within 45 days after the end of each Fiscal Year.

C.    Within 60 days after the end of each Fiscal Year of the Partnership, the General Partners shall send to the Investor Limited Partners (i) the balance sheet of the Partnership as of the end of such Fiscal Year and statements of income (loss), Partners' equity and changes in financial position of the Partnership for such Fiscal Year, all of which shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be accompanied by a report of the Accountants for the Partnership containing an unqualified opinion of the Accountants, and (ii) a statement of Cash Flow for such Fiscal Year (which need not be audited), showing distributions in respect of such Fiscal Year, which statement shall identify distributions from (a) Cash Flow generated during the Fiscal Year, (b) Cash Flow generated during prior Fiscal Years, (c) proceeds from the disposition of property and investments and (d) reserves and other sources.

D.    If the General Partners shall fail, for any reason, to deliver to the Investor Limited Partners when due any of the information or statements required by this Section 7.3, the Partnership shall pay the Investor Limited Partners, as liquidated damages for such failure, an amount equal to $500 for each day that elapses after the respective due date until such information or statements have been delivered to the Investor Limited Partners.  The General Partners hereby jointly and severally guarantee the payment of any amount due to the Investor Limited Partners by the Partnership under this Section 7.3.D; provided, however, that such payments shall not be deemed to be either a capital contribution or a loan from the General Partners, that neither the Partnership nor any Investor Limited Partner shall be under any obligation to repay any such amount paid by the General Partners, and that such payments shall not affect the allocations and distributions provided for in Article IX hereof in any way whatsoever.

E.    Additional Reports.  The General Partner shall submit to Related Capital Company Asset Management Group via telecopy not later than close of business each Monday a weekly occupancy report in the form of Exhibit D annexed hereto until lease-up has been completed and thereafter on a monthly basis.  In addition, the General Partner shall from time to time submit to the Partners such other written reports and information regarding the operations of the Partnership (including the Budget) as may be reasonably required and requested by the Limited Partner to satisfy its reporting requirements to its partners or governmental authorities.  During the construction of the Apartment Complex, the General Partner shall send copies of the monthly construction requisitions simultaneously with the delivery or such requisitions to the Lender to the Partners, Celestine Jones at Related Capital Company, 625 Madison Avenue, New York, New York 10022-1801.  The General Partner shall provide to the Partners by November 30 of each Fiscal Year an estimate of each

W247361.4

Partner's share of profits and losses for Federal and state income tax purposes for such Fiscal Year.

   F. Property Reports. Not later than the fifteenth (15th) day of each calendar month, the General Partner shall transmit the Property Report, in the form of Exhibit C, attached hereto, to the electronic mail address set forth therein, with respect to the month preceding.

   7.4 Other Reports. The General Partners shall from time to time submit to the Partners such other written reports and information regarding the operations of the Partnership as may be required by the Limited Partner to satisfy its reporting requirements to its partners or governmental authorities. The General Partners shall provide to the Partners by November 30 of each Fiscal Year an estimate, which may be prepared by the Accountants, of each Partner's share of profits and losses for Federal and state income tax purposes for such Fiscal Year.

   7.5 Tax Returns and Tax Treatment. The General Partners shall, for each Fiscal Year, file on behalf of the Partnership a United States Partnership Return of Income within the time prescribed by law for such filing. The General Partners shall also file on behalf of the Partnership such other tax returns and other documents from time to time as may be required by the Federal government or by any state or any subdivision thereof. All tax returns shall be prepared by the Accountants. The General Partners shall send a copy of Schedule K-1 or any successor or replacement form thereof, and, upon request, such tax return, to each Partner within 45 days after the expiration of each Fiscal Year.

## ARTICLE VIII

## MANAGEMENT AGENT

### 8.1 Management Agent and Management Fee.

   A. The General Partners shall have the responsibility for managing the Apartment Complex and obtaining a management agent (the "Management Agent"), the choice of which with respect to any successor to the Management Agent at the Admission Date shall be made with the Consent of the Special Limited Partner after accurate and complete disclosure to the Special Limited Partner of any affiliation between the General Partners and such successor. The Management Agent at the Admission Date shall be Somersworth Housing Authority, which is an Affiliate of the General Partner.

   B. The Management Agent shall receive a management fee payable by the Partnership for management services in accordance with the Management Agreement as approved by each Authority (if such approval is necessary) which is intended to be executed by the Partnership as follows (i) as an operational expense of the Partnership, an amount equal to the lesser of 4.0% of the gross rental receipts from the Apartment Complex or $32.00 per dwelling unit; and (ii) an annual bonus payment equal to $6,000, provided, however, that such bonus shall be paid only if and to the

W247361.4

extent that an amount not less than $6,000 is available from savings in the vacancy allowance line item of the annual operational budget prepared in accordance with Section 5.2.C, and payable only upon receipt and acceptance by the New Hampshire Housing Finance Authority of the Partnership's annual audited financial statement; and (iii) an amount equal to the difference between the fee paid pursuant to clause (i) above and six and one-half percent (6.5%) of gross rental receipts of the Partnership shall be paid to the extent of available Cash Flow pursuant to Section 10.1(a)(ii) ; provided, however, that 40% of the management fee payable pursuant to clause (i) above with respect to any Fiscal Year of the Partnership shall not become due and payable unless the Partnership has positive Cash Flow with respect to that Fiscal Year, and any unpaid portion of such management fee may be payable from positive Cash Flow of the Partnership in future Fiscal Years of the Partnership or from Sale or Refinancing Transaction Proceeds. The term of any Management Agreement shall not exceed one year without the Consent of the Special Limited Partner, and no payment or penalty shall be payable by the Partnership for failure to renew any such agreement.

C. The General Partners will have the duty to manage the Apartment Complex during any period when there is no Management Agent and the Partnership will pay the General Partners for such services an annual management fee equal to such amount as each Authority shall approve from time to time or, if no approval is required, a fee equal to the amounts set forth in Section 8.1.B hereof. If at any time the present Management Agent shall cease to act as the Management Agent, the General Partners shall be authorized, subject to the Consent of the Special Limited Partner and the approval of each Authority and Lender (if required) to retain and to enter into a Management Agreement with a different Management Agent on terms at least as favorable to the Partnership as the terms and conditions of the Management Agreement with the present Management Agent, except with the Consent of the Special Limited Partner, which shall not be unreasonably withheld..

D. Subject to the approval of each Authority, if required, the Special Limited Partner shall have the right in the event all of the General Partners are removed as General Partners pursuant to Section 11.4 hereof, to terminate the Management Agreement and every other contract between the Partnership and Affiliates of the General Partners so removed, upon not less than 30 days' written notice to the party contracting with the Partnership. All existing contracts between the Partnership and Affiliates of the General Partners have been amended to contain this right and the General Partners covenant not to enter any future contract with any of their Affiliates which does not contain such right.

## ARTICLE IX

## PROFITS AND LOSSES

9.1     Allocation of Profits and Losses. For tax and accounting purposes, Profits and Losses of the Partnership for each Fiscal Year shall be allocated to the respective classes of Partners as follows:

A. Subject to Section 9.3 hereof, Profits shall be allocated to the Partners in the following order of priority:

47

W247361.4

(i) First to the General Partner until the General Partner has been allocated pursuant to this Section 9.1.A(i) for the current and prior Fiscal Years an amount equal to the Losses allocated to the General Partner pursuant to the last sentence of Section 9.1.B for all prior Fiscal Years;

(ii) Second, 99.98% to the Limited Partner, .01% to the Special Limited Partner, .0051% to SCDC and .0049% to FSHLLC. until the Partners have been allocated pursuant to this Section 9.1.A(ii) for the current and prior Fiscal Years, an amount equal to the lesser of (x) the aggregate Losses previously allocated to the Partners pursuant to Section 9.1.B hereof (other than pursuant to the last sentence thereof) for all prior Fiscal Years to the extent such Losses are greater than the aggregate allocations of Profits previously allocated to the Limited Partner pursuant to this Section 9.1.A(ii) or (y) an amount necessary to eliminate the Limited Partner's Adjusted Capital Account Deficit, if any; and

(iii) Thereafter, to the Partners in accordance with the cumulative distributions pursuant to Sections 10.1(j) and 10.2(i) hereof with respect to the current and all prior Fiscal Years until the aggregate amount allocated to each Partner pursuant to this Section 9.1.A(iii) equals the aggregate amount distributed to each Partner pursuant to Sections 10.1(j) and 10.2(i) hereof; provided that if the Profits allocable under this Section 9.1.A(iii) for the current and all prior Fiscal Years exceed the cumulative distributions pursuant to Sections 10.1(j) and 10.2(i) with respect to the current and all prior Fiscal Years ("Excess Income"), then the Excess Income derived in the current Fiscal Year shall be allocated to the Partners in accordance with the distribution that would have been made pursuant to Sections 10.1(j) and 10.2(i) hereof had there been such distribution for the current Fiscal Year.

B. Subject to Section 9.3 hereof, Losses shall be allocated .0051% to SCDC and .0049% to FSHLLC, 99.98% to the Limited Partner and .01% to the Special Limited Partner; provided that the Losses allocated pursuant to this Section 9.1.B shall not exceed the maximum amount of Losses that can be so allocated without causing any Investor Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year of the Partnership. All Losses which would have been allocated to the Investor Limited Partners but for the proviso set forth in the preceding sentence shall be allocated to the General Partner.

C.   Nonrecourse Liabilities of the Partnership shall be specially allocated 99.98% to the Limited Partner, .01% to the Special Limited Partner .0051% to SCDC and .0049% to FSHLLC.

D. (i) Nonrecourse Deductions for any Fiscal Year of the Partnership or other period shall be specially allocated 99.98% to the Limited Partner, .01% to the Special Limited Partner .0051% to SCDC and .0049% to FSHLLC.

(ii) Any Partner Nonrecourse Deductions for any Fiscal Year of the

48

W247361.4

Partnership or other period shall be specially allocated to the Partner who bears the risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i) of the Regulations. If with respect to any Fiscal Year the Guarantor (or the General Partner) shall make Operating Loans or shall otherwise be required to advance money to pay or otherwise satisfy operating deficits on behalf of the Partnership, it shall be deemed that such Operating Loans or such other advances were first applied to the payment of deductible expenses with respect to such Fiscal Year up to the aggregate amount of such Operating Loans and/or such advances, and the deductions for such expenses shall be allocated to the General Partner. In no event, by reason of the foregoing, shall the General Partner be allocated deductions attributable to Depreciation of the Property. If such Operating Loans or other advances with respect to any Fiscal Year shall exceed the deductible expenses allocable to the General Partner pursuant to this subparagraph, the General Partner shall be allocated deductible expenses (not attributable to Depreciation) in subsequent Fiscal Years until the aggregate amount of deductions allocated to the General Partner is equal to the amount of Operating Loans or other operating deficit advances.

E. All Credits shall be allocated 99.98% to the Limited Partner, .01% to the Special Limited Partner .0051% to SCDC and .0049% to FSHLLC. In the event there occurs a recapture of Credits previously allocated among the Partners, the responsibility for the recapture of such Credits shall be allocated among the Partners in proportion to the amount of Credits originally allocated to each Partner. All deductions for charitable contributions made by the Partnership shall be allocated 99.98% to the Limited Partner, .01% to the Special Limited Partner .0051% to SCDC and .0049% to FSHLLC.

F. Where a distribution of an asset is made in the manner described in Section 734 of the Code, or where a transfer of an Interest permitted by this Agreement is made in the manner described in Section 743 of the Code, the Partnership shall file, upon the request of the Special Limited Partner, an election under Section 754 of the Code, in accordance with the procedures set forth in the applicable Regulations. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) or 743(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations. Subject to Section 5.2 hereof, all other elections required or permitted to be made by the Partnership under the Code shall be made in such manner as, in the opinion of the General Partner with the Consent of Special Limited Partner and with the advice of the Accountants and legal counsel for the Partnership, will be most advantageous to the Limited Partner.

G. Except as otherwise provided herein, each Partner shall be allocated Profits and Losses in accordance with this Section 9.1 from the date on which it is admitted to the Partnership. For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as

49

determined by the General Partners using any permissible method under Section 706 of the Code and the Regulations promulgated thereunder.

H. Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction, and any other allocations not otherwise provided for herein shall be divided among the Partners in the same proportions as they share Profits or Losses, as the case may be, for the Fiscal Year of the Partnership.

I. During any Fiscal Year allocation of Profits or Losses which do not arise from a Sale or Refinancing Transaction shall be made before allocation of Profits or Losses arising from a Sale or Refinancing Transaction.

J. If any fee or other compensation payable from the Partnership to a Partner or an Affiliate of a Partner is treated as a distribution for income tax purposes, there shall be allocated to the recipient Partner or to the Partner affiliated with such Affiliate, an amount of income equal to the amount of such payment in the year in which such payment is made or in the first succeeding year in which the Partnership realizes income.

     9.2   [Intentionally Omitted]

     9.3   Overriding Allocations of Profits and Losses.

A. (i) Notwithstanding anything contained in Section 9.1 hereof or this Section 9.3 to the contrary, if there is a net decrease in Partnership Minimum Gain during a taxable year of the Partnership, then there shall be allocated to each Partner, before any other allocation of any item of income, gain, loss, deduction or credit is made for such taxable year, items of income and gain for such taxable year (and, if necessary, for subsequent taxable years), in the order provided in Section 1.704-2(j)(2) of the Regulations, equal to such Partner's share of the net decrease in Partnership Minimum Gain during such year as specified in Section 1.704-2(g)(2) of the Regulations, unless an exception specified in Section 1.704-2(f) of the Regulations applies. The allocation contained in this Section 9.3.A(i) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.A(ii), 9.3.B, 9.3.D and 9.3.E hereof.

(ii) Notwithstanding anything contained in Section 9.1 hereof or this Section 9.3 to the contrary, except Section 9.3.A(i) hereof, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a taxable year of the Partnership, then there shall be allocated to each Partner who has a share of the Partner Nonrecourse Debt Minimum Gain determined in accordance with Section 1.704-2(i)(5) of the Regulations, items of income and gain for such taxable year (and, if necessary, subsequent taxable years), in the order provided in Section 1.704-2(j)(2) of the Regulations, equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain during such year as specified in Section 1.704-2(i)(5) of the Regulations, unless an exception

50

specified in Section 1.704-2(i)(4) of the Regulations applies. The allocation contained in this Section 9.3.A(ii) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.B, 9.3.D and 9.3.E hereof.

(iii) The Partnership Minimum Gain and, accordingly, the minimum gain chargeback requirement amount for each partner as of the date of this Agreement, shall be zero (0).

B. Notwithstanding any provisions of Section 9.1 hereof or this Section 9.3 to the contrary, but subject to the provisions of Section 9.3.A hereof, in the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704.1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain (including gross income) shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible, provided that an allocation pursuant to this Section 9.3.B shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IX have been tentatively made as if this Section 9.3.B were not in this Agreement. In the event that any such adjustments, allocations or distributions create an Adjusted Capital Account Deficit for more than one Partner in any taxable year of the Partnership, all such items of income and gain of the Partnership for such taxable year and all subsequent taxable years shall be allocated among all such Partners in proportion to their respective Adjusted Capital Account Deficits in such amount and manner sufficient to eliminate such Adjusted Capital Account Deficits as quickly as possible. The allocation contained in this Section 9.3.B is intended to comply with the qualified income offset requirement in Section 1.704-1(b)(2)(ii)(d) of the Regulations, and shall be interpreted consistently therewith. Thereafter, subject to Section 9.3.F hereof, all Profits and Losses shall be allocated as provided for in Sections 9.1, 9.3.D and 9.3.E hereof.

C. [Intentionally Omitted].

D. Notwithstanding any provisions of Section 9.1 hereof or this Section 9.3 to the contrary, but subject to the provisions of Sections 9.3.A and 9.3.B hereof:

(i) (a) in accordance with Section 704(c) of the Code and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners as provided in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Partnership for Federal income tax purposes and its initial Gross Asset Value; (b) in the event the Gross Asset Value of any Partnership asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for Federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Regulations

51

promulgated thereunder; and (c) any elections or other decisions relating to the allocations provided in this Section 9.3.D(i) shall be made by the General Partners with the Consent of the Special Limited Partner as provided in Section 704(c) of the Code in any manner that reasonably reflects the purpose and intention of this Agreement; allocations pursuant to this Section 9.3.D(i) are solely for purposes of Federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement;

(ii) the General Partners shall be allocated any imputed interest expense with respect to any Operating Loans;

(iii) [Intentionally Omitted].

(iv) in the event any Investor Limited Partner has a deficit Capital Account balance at the end of any Fiscal Year of the Partnership that is in excess of the sum of (a) the amount such Partner is obligated to restore to its Capital Account (pursuant to the terms of such Partner's promissory note or otherwise) and (b) the amount such Partner is deemed to be obligated to restore to its Capital Account pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.3.D(iv) shall be made if and only to the extent that such Partner would have a deficit Capital Account balance in excess of such sum after all other allocations provided for in this Article IX have been tentatively made as if Section 9.3.B hereof and this Section 9.3.D(iv) were not in this Agreement;

(v) to the extent the Partnership has taxable interest income with respect to any promissory note issued by a Partner to the Partnership:

(a) such interest income shall be specially allocated to the Partner issuing such promissory note; and

(b) the amount of such interest income shall be excluded from the Capital Contributions credited to such Partner's Capital Account in connection with payments of principal with respect to such promissory note;

(vi) the Limited Partner shall be allocated an amount of Profits resulting from a Sale or Refinancing Transaction equal to the Return Amount.

E. (i) The "Regulatory Allocations" consist of the "Basic Regulatory Allocations," as defined in Section 9.3.E(ii) hereof, the "Nonrecourse Regulatory Allocations," as defined in Section 9.3.E(iii) hereof, and the "Partner Nonrecourse Regulatory Allocations," as defined in Section 9.3.E(iv) hereof.

52

(ii) The "Basic Regulatory Allocations" consist of (a) allocations pursuant to the last sentence of Section 9.1.B hereof, and (b) allocations pursuant to Sections 9.1.F, 9.3.B, and 9.3.E(iv) hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this Section 9.3.E(ii) shall only be made with respect to allocations pursuant to Section 9.1.F hereof to the extent the General Partners reasonably determine that such allocations will otherwise be inconsistent with the economic agreement among the Partners.

(iii) The "Nonrecourse Regulatory Allocations" consist of all allocations pursuant to Sections 9.1.D(i) and 9.3.A(i) hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Nonrecourse Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Nonrecourse Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, (a) no allocations pursuant to this Section 9.3.E(iii) shall be made prior to the taxable year of the Partnership during which there is a net decrease in Partnership Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Partnership Minimum Gain, and (b) allocations pursuant to this Section 9.3.E(iii) shall be deferred with respect to allocations pursuant to Section 9.1.D(i) hereof to the extent the General Partners reasonably determine that such allocations are likely to be offset by subsequent allocations pursuant to Section 9.3.A(i) hereof.

(iv) The "Partner Nonrecourse Regulatory Allocations" consist of all allocations pursuant to Sections 9.1.D(ii) and 9.3.A(ii) hereof. Notwithstanding any other provision of this Agreement, other than the Regulatory Allocations, the Partner Nonrecourse Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other items and the Partner Nonrecourse Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Partner Nonrecourse Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, (a) no allocations pursuant to this Section 9.3.E(iv) shall be made with respect to allocations pursuant to Section 9.1.D(ii) hereof relating to a particular Partner Nonrecourse Debt prior to the taxable year of the Partnership during which there is a net decrease in Partner Minimum Gain attributable to such Partner Nonrecourse Debt, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Partner Minimum Gain, and (b) allocations pursuant to this Section 9.3.E(iv) shall be deferred with respect to allocations pursuant to Section 9.1.D(ii) hereof relating to a particular Partner Nonrecourse Debt to the extent the General Partners reasonably determine that such allocations are likely to be offset by subsequent allocations pursuant to Section 9.3.A(ii) hereof.

W247361.4

(v) The General Partner shall have reasonable discretion, with respect to each taxable year of the Partnership, to (a) apply the provisions of Sections 9.3.E(ii), (iii) and (iv) hereof in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations, and (b) divide all allocations pursuant to Sections 9.3.E(ii), (iii) and (iv) hereof among the Partners in a manner that is likely to minimize such economic distortions.

(vi) To the extent that Section 9.1 hereof in any of its subsections provides for references to the allocation of Profits or Losses pursuant to particular subsections within Section 9.1 hereof, including, without limitation, the aggregate Profits or Losses previously allocated pursuant to a subsection, such subsection references shall be deemed to incorporate allocations of Profits or Losses pursuant to this Section 9.3 to the extent that the allocation of Profits or Losses pursuant to this Section 9.3 is of the same category of Profits or Losses.

F. Notwithstanding anything to the contrary contained herein, Sections 9.3.A and 9.3.B hereof shall be applied in the order provided in Section 1.704-2 of the Regulations.

G. Any allocations made pursuant to this Section 9.3 shall be taken into account in the making of subsequent allocations under other sections of this Article IX in a manner that will, to the maximum extent possible, avoid or eliminate duplicative or excessive allocations of income to any Partner.

9.4   Certain Additional Allocations.

A. For income tax purposes, if the Partnership in any year realizes income or is allowed a deduction (including additional depreciation or amortization as a result of adding an item to its basis) as a result of the transfer of an Interest or the transfer of an interest in property to or from a Partner, the difference between the amount taken into account for tax purposes and the amount otherwise taken into account under this Agreement shall be allocated solely to such Partner.

B. In the event there is more than one General Partner, all Profits and Losses or distributions to the General Partner as a Class shall be allocated among the General Partners as they shall agree; provided, however, that any not-for-profit General Partner shall not be allocated Profits or Losses or be distributed distributions greater than .01% of Partnership Profits, Losses and distributions; and further provided that any such allocation must have substantial economic effect as defined in Section 1.704-1(b)(2) of the Regulations.

C. Solely for purposes of determining a Partner's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Regulations, the Partner's interests in Partnership Profits are as provided in Section 9.1.D hereof.

D. To the extent permitted by Sections 1.704-2(h) and 1.704-2(i)(6) of the Regulations, the General Partner shall endeavor to treat distributions of Cash Flow or Sale or

54

Refinancing Transaction Proceeds as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for the General Partners.

E. Prior to Completion, all Profits and Losses (other than Depreciation) arising from operations of the Apartment Complex shall be allocated to the General Partner. Prior to Completion, all Profits and Losses (other than Depreciation) arising from the investment of Capital Contributions, after deduction of all applicable interest expenses (including all investment interest expense prior to Completion which is not capitalized), shall be allocated to the General Partner.

F. The Partners are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article IX in reporting their shares of Partnership income and loss for income tax purposes.

## ARTICLE X
### DISTRIBUTIONS AND APPLICATION OF CASH FLOW AND PROCEEDS FROM SALE OR REFINANCING TRANSACTIONS

Except as otherwise provided by this Agreement or required by law (including all applicable rules, directives and regulations of each Authority), cash distributions shall be made to the Partners on the following bases within 60 days after the end of each calendar quarter following the Break-Even Date.

10.1   Cash Flow. Cash Flow shall be applied in the following order of priority:

(a)   To the Management Agent, an amount equal to (i) any portion of the management fee which has been deferred pursuant to the provisions of Section 8.1.B and (ii) an amount equal to the management fee payable pursuant to Section 8.1.B(iii);

(b)   To Investor Limited Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them;

(c)   To the Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them, but not including any Operating Loans or other loans made by the General Partner in order to fulfill any obligation of the General Partner hereunder;

(d)   To the Special Limited Partner, an amount equal to the unpaid Annual Local Administrative Fee payable under Section 6.2;

(e)   To the Developer, to pay any outstanding amounts due under the Development

Agreement;

(f)     To FSHLLC, an amount equal to the amount, if any, by which the actual Tax Credits allocated to the Limited Partner in respect to 2003 exceed zero, which difference shall be multiplied by .7528 (provided however, that no amounts shall be distributed to FSHLLC pursuant to this Section 10.1(f) if any Credits are or will be subject to Section 42(f)(3)(A) of the Code (relating to so-called two-thirds Credits)) ;

(g)     To the extent of 50% of the Cash Flow remaining after distributions under Sections 10.1(a) through (f) have been made, to the Guarantor an amount or amounts equal to the unpaid balance of any Operating Loan made by it; and

(h)     To the extent of 60% of the Cash Flow remaining after distributions under Sections 10.1(a) through (g) have been made, to FCLLC for the supervisory management fee payable pursuant to Section 6.3;

(i)     The balance, 39.98% to the Limited Partner, 60.00% to FSHLLC, .01% to SCDC and .01% to the Special Limited Partner.

10.2   Proceeds from Sale or Refinancing Transactions.   Subject to the provisions of Sections 8.1, 10.4 and 13.4 hereof, Sale or Refinancing Transaction Proceeds shall be applied in the following order of priority:

(a)     To the payment of all of the expenses of such Sale or Refinancing Transaction, and, with regard to damage recoveries or insurance or condemnation proceeds (other than for temporary loss of use), to the payment of all repairs, replacements or renewals resulting from damage to or partial condemnation of the affected property;

(b)     To the payment of all debts and obligations of the Partnership due upon the occurrence of such Sale or Refinancing Transaction other than amounts owing to Partners;

(c)     To establish such reserves as the General Partners in their sole discretion determine to be reasonably necessary for any contingent or foreseeable liability or obligation of the Partnership; provided, however, that the balance of any such reserve remaining at such time as the General Partners shall reasonably determine that such reserve is no longer necessary shall be distributed in accordance with subparagraphs (d) through (j) of this Section 10.2;

(d)     To the Management Agent, an amount equal to any portion of the management fee which has been deferred pursuant to the provisions of Section 8.1.B;

(e)     To the Special Limited Partner, an amount equal to the unpaid Annual Local Administrative Fee payable under Section 6.2;

56

W247361.4

(f)  To the Investor Limited Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them;

(g)  To the General Partner and Guarantor, an amount or amounts equal to the unpaid balances of any Voluntary Loan or Operating Loan made by them, respectively;

(h)  To the Developer, to pay any outstanding amounts due under the Development Agreement;

(i)  The balance, if any, 14.98% to the Limited Partner, .01% to the Special Limited Partner, .01% to SCDC and 85.00% to FSHLLC.

10.3  Except as otherwise provided in this Article X, each Partner shall share in distributions in accordance with this Article X from the date on which such Partner is admitted to the Partnership.

10.4  In the event that the amount of the Credits finally allowed to the Partnership and allocated to the Limited Partner during any calendar year during the Credit Period with respect thereto starting with 2004 is less than $244,456 for any reason, other than a change in the tax laws enacted after the date of this Agreement or the acts or omissions of the Limited Partner, and the Limited Partner has not otherwise been compensated for such shortfall pursuant to Section 3.4.B hereof, the "Return Amount" shall be calculated. The "Return Amount" shall be an amount (to the extent such amount is a positive number) equal to the excess of (a)(I) $244,456 less the amount of Credits finally allowed to the Partnership and allocated to the Limited Partner with respect to any such calendar year plus (II) 12% per annum on the amount specified in the immediately preceding clause (I) calculated from the end of the calendar year in question until the Return Amount is paid as provided herein, over (b)(I) the amount of Credits finally allowed to the Partnership and allocated to the Limited Partner with respect to any other calendar year during the Credit Period less $244,456 plus (II) 12% per annum on the amount specified in the immediately preceding clause (II) calculated from the end of the calendar year in question until the Return Amount is paid as provided herein; provided, however, that any Credits with respect to which the Limited Partner has theretofore received a payment pursuant to the Recapture Guaranty Agreement shall be deemed to have been finally allowed for the purposes of this Section 10.4. If the Partnership claims Credits for less than 12 calendar months with respect to any taxable year, then the calculation of the Return Amount with respect to such taxable year shall be made by proportionally prorating the $244,456 amount. At the time of distribution of any Cash Flow pursuant to Section 10.1 or Sale or Refinancing Transaction Proceeds pursuant to Section 10.2. hereof, there shall be distributed to the Limited Partner, out of any Cash Flow or Sale or Refinancing Transaction Proceeds that would otherwise have been distributed to the General Partner or its Affiliates under such sections, an amount equal to the Return Amount, before the General Partner or its Affiliates shall be distributed any such proceeds pursuant to such Sections. Notwithstanding the foregoing, to the extent that the Return Amount is determined with respect to any year prior to the payment of Limited Partner's Capital Contributions and the Limited Partner has not otherwise been compensated for such shortfall pursuant to Section 3.4.B hereof, the

57

Limited Partner shall have the right to offset its final payment of the Capital Contribution by the Return Amount. For purposes of this Section 10.4, a Credit with respect to a taxable year shall be deemed finally allowed if claimed on an income tax return filed by the Partnership and which remains allowed upon the latest to occur of the following: (I) the period for assessment of a deficiency for such taxable year shall have expired without a deficiency being assessed by the Internal Revenue Service against any Partner with respect to the Credit claimed by the Partnership for such taxable year; or (II) if such deficiency is so assessed, the determination by the Internal Revenue Service as to the amount of the Credit for such taxable year is no longer subject to petition to the United States Tax Court; or (III) if a petition with respect to such determination is filed with such court, a decision by such court as to the amount of the Credit for such taxable year becomes final and not subject to appeal; or (IV) if an appeal from such decision is filed, a decision of a court upon such appeal becomes final and not subject to further appeal. Except as otherwise provided in this Section 10.4, any Credits which are recaptured pursuant to Section 42 of the Code, other than due to an Assignment of an Interest or a disposition of the Apartment Complex that occurs with the Consent of the Special Limited Partner, shall be deemed not to have been finally allowed for purposes of this Section 10.4.

ARTICLE XI

TRANSFER OF LIMITED PARTNER INTERESTS

11.1   Assignment of Limited Partner Interests.

A.    Prior to the payment of the Capital Note, the Limited Partner and the Special Limited Partner shall have the right to make an Assignment of their Interests only with the consent of the Managing General Partner; provided, however, that the Limited Partner and the Special Limited Partner shall have the right to assign their respective Interests to any entity which is an Affiliate of Related Capital Company without first obtaining the consent of the Managing General Partner. After the payment in full of the Capital Note, the Limited Partner and the Special Limited Partner shall have the right at any time to make an Assignment of their Interests without the consent or approval of the General Partners or any other Partner, provided that the Assignee of such Interests shall be an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933. The General Partners shall cooperate with the Limited Partner and the Special Limited Partner in facilitating such Assignment by promptly furnishing complete and accurate financial and other relevant data regarding the Partnership, the Apartment Complex, the General Partners and the Affiliates of the General Partners and any other matters reasonably necessary in the judgment of the Special Limited Partner to facilitate and effect such Assignment. Each Assignee of an Interest transferred in accordance with this Section 10.1 shall be automatically admitted to the Partnership as a Substituted Partner without necessity of the General Partners' approval; provided, however, that each Substituted Limited Partner or Substituted Special Limited Partner shall execute such instrument

58

or instruments as shall be required by the General Partners to signify its agreement to be bound by all the provisions of this Agreement, the Project Documents, if required, and shall pay reasonable legal fees and filing costs in connection with its substitution as a limited partner hereunder. The Limited Partner and the Special Limited Partner shall notify the General Partners as to any proposed Assignment of their Interests not less than five (5) business days prior to such Assignment.

B.    So long as the Pledge Agreement shall not have been released in accordance with its terms, (i) the Interests will not be, and will not become, "investment property" or held in a securities account within the meaning of the New York Uniform Commercial Code (the "NY UCC") or the Uniform Commercial Code in effect in the State (the "State UCC") and will be, and will remain, "general intangibles" within the meaning of Article 9 of the NY UCC and the State UCC and (ii) any action by any Partner to cause any of the Interests to be deemed to be or to be treated as a "security" or as "investment property" or to be held in a "securities account" within the meanings of Article 8 and Article 9, respectively, of the NY UCC or the State UCC, shall be void and of no effect unless (a) such Interests are certificated and (b) the certificates evidencing the Limited Partner Interests, together with assignments executed in blank by the Limited Partner, are delivered to the Partnership.

11.2  Substituted Partners; Admission.

A.  The General Partners may not admit any additional partners to the Partnership without the Consent of the Special Limited Partner.

B.  Any Assignee shall not be admitted as a Substituted Partner unless (i) the Assignee expressly agrees to be bound, to the same extent as the Assignor, by the provisions of this Agreement, the Project Documents and any other documents required in connection therewith and to assume the obligations of the Assignor hereunder and (ii) the Assignee shall have agreed to pay all reasonable expenses and legal fees relating to the Assignment and its admission as a Substituted Partner and (iii) such Assignee is an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933.

C.  Upon the admission of a Substituted Partner, Schedule A shall be amended to reflect the name and address of such Substituted Partner and to eliminate the name and address of the Assignor, and an amendment to this Agreement reflecting such admission shall be filed in accordance with the Uniform Act. No consent or approval of any Limited Partner or Special Limited Partner (other than the Assignor and the Assignee) shall be required and the General Partners may exercise the power of attorney granted in Section 15.2 hereof to effect the provisions of this Article X.

11.3  Assignees.

A.  Any Person who acquires in any manner whatsoever any Interest, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be

59

subject to and bound by all the obligations of this Agreement that any predecessor in interest of such Person was subject to or bound by.   A Person acquiring an Interest, including the personal representatives and heirs of a deceased Partner, shall have only such rights, and shall be subject to all the obligations, as are set forth in this Agreement; and, without limiting the generality of the foregoing, such Person shall not have any right to have the value of his Interest ascertained or receive the value of such Interest or, in lieu thereof, profits attributable to any right in the Partnership, except as herein set forth.

B.  Any Assignee of an Interest pursuant to an Assignment satisfying the conditions of this Article X who does not become a Substituted Partner in accordance with this Article X shall have the right to receive the same share of the profits and losses and distributions of the Partnership to which his Assignor would have been entitled.  If such Assignee desires to make an Assignment of his Interest, he shall be subject to all the provisions of this Article X to the same extent and in the same manner as any Partner desiring to make an Assignment.

C.  Any Partner who shall Assign all of his Interest shall cease to be a Partner and shall no longer have any rights or privileges of a Partner except that, unless and until his Assignee is admitted to the Partnership as a Substituted Partner in accordance with this Article X, such Assignor shall retain all rights and be subject to all obligations under the Uniform Act.

D.  In the event of an Assignment, the obligation of the Assignor to make Capital Contributions hereunder shall be extinguished only by and to the extent of Capital Contributions made by him or his Assignee.

E.  In the event that an Assignment shall be made, there shall be filed with the Partnership a duly executed and acknowledged counterpart of the instrument making such Assignment.  Such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Agreement.  If such an instrument is not so filed, the Partnership need not recognize any such purported Assignment for any purpose.

## ARTICLE XII

### WITHDRAWAL OF A GENERAL PARTNER; NEW GENERAL PARTNER

12.1  Withdrawal.

A.  A General Partner may not Withdraw (other than an Involuntary Withdrawal) from the Partnership or Assign, pledge or encumber all or any part of its General Partner Interest without the Consent of the Special Limited Partner, and, to the extent required, of each Authority and each Lender.  The consent of the Limited Partner shall not be required.  For purposes of this Agreement, the sale, transfer, or other conveyance, or the pledge or encumbering, of any share of capital stock of

a General Partner, shall be deemed an Assignment by that General Partner of its General Partner Interest.

B. Each General Partner shall indemnify and hold harmless the Partnership and all Partners from any Withdrawal or Assignment in violation of Section 11.1.A hereof or in violation of any of the Project Documents. In the event of a Withdrawal of a General Partner (other than an Involuntary Withdrawal) or the Assignment, pledge or encumbrance of any part of its General Partner Interest in violation of Section 12.1.A hereof, the Interest of the General Partner who so Withdrew, Assigned, pledged or encumbered any part of its Interest shall immediately and automatically terminate on the effective date of such Withdrawal (or the effective date of such Assignment, pledge or encumbrance) and such General Partner shall have no further right to participate in the management or operation of the Partnership or to receive any future allocations of profits and losses, any distributions from the Partnership or any other funds or assets of the Partnership, nor shall it be entitled to receive or to be paid by the Partnership any further payments of fees (including fees which have been earned but are unpaid) or to be repaid any outstanding advances or loans made by it to the Partnership. From and after the effective date of such Withdrawal, Assignment, pledge or encumbrance, the rights of the Withdrawing General Partner to receive or to be paid such allocations, distributions, funds, assets, fees or repayments shall be reallocated to the other General Partner or General Partners, or if there is no other general partner of the Partnership at that time, to the Special Limited Partner. Notwithstanding such Withdrawal, Assignment, pledge or encumbrance, and loss of any right to receive such allocations, distributions, funds, assets, fees and repayments, the Withdrawing General Partner shall remain liable to the Partnership and the other Partners for all obligations theretofore incurred by it under this Agreement, which may arise upon such Withdrawal, Assignment, pledge or encumbrance. Notwithstanding anything herein to the contrary, any remaining Partner shall have all other rights and remedies against the Withdrawing General Partner as provided by law.

C. Upon the Involuntary Withdrawal of a General Partner, its General Partner Interest shall automatically become an Interest of a Class B Limited Partner. Subject to the provisions of Section 12.3.B hereof, the Class B Limited Partner shall be entitled to receive the fees payable to the Withdrawing General Partner set forth in Article VI hereof, to be repaid any outstanding advances or loans made by the Withdrawing General Partner to the Partnership and to share in the profits and losses and distributions at the same times and in the same manner as the Withdrawing General Partner would have otherwise received as a General Partner, but shall not be entitled to participate in the management of the Partnership's business or to participate in any allocation of profits and losses and distributions payable to the Limited Partner or the Special Limited Partner.

12.2 Effect of Withdrawal; Election to Continue Business. Upon the occurrence of an event giving rise to a Withdrawal of a General Partner, (A) any remaining General Partner, if any, or, if there be no remaining General Partner, the Withdrawing General Partner or its legal representative shall promptly notify the Investor Limited Partners of such Withdrawal (the "Withdrawal Notice"), (B) whether or not the Withdrawal Notice shall have been sent as provided herein, the Special Limited Partner shall have the right to become an additional General Partner (and to become the

61

Managing General Partner if the Withdrawing General Partner was previously the Managing General Partner) and (C) the Partnership shall be dissolved and terminated unless the then General Partner or all of the then General Partners elect to continue the business of the Partnership. The Withdrawal of a General Partner shall not be deemed to be effective until the expiration of 90 days from the day on which the Withdrawal Notice has been mailed to the Investor Limited Partners, unless the Special Limited Partner shall have elected to become an additional General Partner as provided herein, whereupon the withdrawal of that General Partner shall be deemed effective upon the notification of all the other Partners by the Special Limited Partner of such election. A Withdrawn General Partner shall remain liable for obligations incurred by it under this Agreement through the effective date of its Withdrawal, even if such Withdrawal shall be an Involuntary Withdrawal and in compliance with or in violation of this Agreement.

### 12.3   Formation of New Partnership.

A.   Subject to the provisions of Section 12.1.A hereof, upon the occurrence of an event giving rise to the Withdrawal of a General Partner, if there is then no other General Partner, or, if there is then one or more other General Partners, but the remaining General Partner or General Partners or the Special Limited Partner do not elect to continue the business of the Partnership pursuant to Section 12.2 hereof, the Investor Limited Partners may elect within 120 days thereafter to form a new partnership on substantially identical terms to those of this Agreement to carry on the business of the Partnership. In so doing, the Investor Limited Partners shall designate a successor general partner to serve in place of the Withdrawing General Partner with the approval of each Authority and each Lender, if such approval is required; provided, however, that no Person shall be designated or admitted as a successor general partner if he is below the age of majority in the State or has theretofore been adjudged insane or incompetent.

B. (i)   If the Investor Limited Partners shall designate a successor general partner and obtain all necessary approvals therefor, the Class B Limited Partner Interest of the Withdrawing General Partner where the Withdrawal was Involuntary shall be transferred to the successor general partner upon its written assumption of the obligations of the Withdrawing General Partner under this Agreement (except for any obligations of the Withdrawing General Partner under this Agreement specifically excepted by the Special Limited Partner). In such event, the successor general partner shall pay to the Withdrawing General Partner or its legal representative as the purchase price for its Class B Limited Partner Interest an amount to be agreed upon between them.

(ii)   In the event of an Involuntary Withdrawal, the Limited Partner shall purchase the Interest of such General Partners for an amount to be agreed upon between them. If such Withdrawing General Partner and the Limited Partner cannot agree upon the consideration for the transfer of such Interest within 60 days after such removal, consideration therefor shall be the fair market value of such Interest as determined by a committee of three qualified real estate appraisers, one selected by the Withdrawing General Partner, one selected by the Special Limited Partner and a third selected by the other two real estate appraisers (or, if the first two real estate appraisers cannot agree upon the third real estate appraiser within 30 days, such third appraiser shall be selected by the

62

American Arbitration Association). The purchase of the Withdrawing General Partner's Interest under this Section 12.3.B(ii) shall take place within ten days after the purchase price is determined (whether by agreement or appraisal), and the closing shall take place at the office of the Special Limited Partner. The purchase price for such Interest shall be payable by a promissory note bearing interest at a rate equal to the Prime Rate and payable solely out of Sale or Refinancing Transaction Proceeds, shall be secured by the Interest being purchased and shall otherwise be without recourse to the Limited Partner.

(iii) Unless any other General Partner shall agree to continue the Partnership pursuant to Section 12.2 hereof, the Interest of such other General Partner other than the Withdrawing General Partner shall be converted into and shall be deemed to be that of a Class B Limited Partner with the same interest in the Partnership as such General Partner had as a general partner prior to the Withdrawal (as reduced in the manner set forth in Section 12.3.B(iv) hereof).

(iv) If no agreement can be reached as to the amount of the purchase price for the Class B Limited Partner Interest of the Withdrawing General Partner under Section 12.3.B(i) hereof and if the successor general partner does not own a 1% interest in all material items of profits and losses and distributions of the Partnership, each limited partner of the Partnership (including the person succeeding to the Interest of the Withdrawing General Partner as a Class B Limited Partner and any other Class B Limited Partner) shall transfer a pro rata portion of his Interest to the successor general partner in an amount sufficient to give the successor general partner such 1% interest and the successor general partner shall pay to each limited partner of the Partnership (including the person succeeding to the Interest of the Withdrawing General Partners as a Class B Limited Partner and any other Class B Limited Partner) as the purchase price for his Interest, an amount determined by the Special Limited Partner.

C. In exercising the election permitted under Section 12.3.A hereof, the successor general partner and all the limited partners of the Partnership agree to be bound by the provisions of this Agreement; provided, however, that if this Agreement is amended by them, no amendment shall be made without the Consent of the Special Limited Partner and unless counsel to the Partnership shall issue an opinion that the Partnership shall continue to be treated as a partnership for Federal income tax purposes; provided further, however, that the amended agreement shall be as similar in form and substance to this Agreement as practicable and the successor partnership shall engage in the same business as the Partnership employing the assets and name of the Partnership to the extent possible.

D. Any new limited partnership formed pursuant to this Section 12.3 shall succeed to all rights and assets of the Partnership subject to all liabilities of the Partnership. Each limited partner of the Partnership shall be a limited partner of any limited partnership formed pursuant to this Section 12.3 and agrees to execute all documents and take such further action as may be necessary in connection therewith. Until such time as the new limited partnership agreement is executed by all of the Partners, this Agreement shall continue to be binding on all of the partners of the Partnership. Upon execution of a declaration to be bound by the terms of this Agreement and delivery of such

declaration to any partner of the Partnership, the general partner of such new limited partnership shall succeed to all the rights and liabilities of the then general partners of the Partnership under this Agreement.

12.4  Special Removal Rights.

A.  Notwithstanding any other provision of this Agreement to the contrary, in the event that

(i)  any General Partner shall:

(a)  materially violate its fiduciary responsibilities as a General Partner of the Partnership;

(b)  be in material breach of this Agreement, the Contribution Agreement or any of the Other Guarantees for ten days after notice thereof has been given by the Special Limited Partner; provided, however, that if such breach is of the type that cannot reasonably be cured within ten days, the Special Limited Partner shall not have the right to remove a General Partner under this Section 12.4.A(i)(b) with respect to such breach for a 60-day period after such notice is given so long as the General Partners are diligently pursuing a cure Of such breach at all times during such 60 day period;

(c)  willfully violate any law, regulation or order applicable to the Partnership which has a material adverse financial impact on the Partnership or the Apartment Complex; or

(d)  become Bankrupt,

(ii)  the Partnership shall:

(a)  be in material breach of any Project Document (other than the Contribution Agreement) or any other material agreement or document affecting the Partnership or the Investor Limited Partners to which it is a party; or

(b)  (I) at any time (v) prior to the commencement of the Guaranty Period, if the Guarantor is at such time in default of its obligations under the Development Deficit Guaranty Agreement, or (w) during the Guaranty Period, if the Guarantor is at such time in default of its obligations under the Operating Deficit Guaranty Agreement after a period of ten (10) days after written notice thereof, or (x) after termination of the Guaranty Period, the Partnership shall have realized at least $5,000 in Operating Deficits in each calendar month for a period of six consecutive months and the General Partner shall have failed to make an Operating Loan to the Partnership in the aggregate amount of such deficits within thirty (30) days following written notice thereof, (II) after Rental Achievement, the Partnership shall have had less than 95% of the apartment units in the

64

Apartment Complex eligible to receive the Credits in any month, (III) after Rental Achievement, the Partnership shall have had the qualified basis (as defined in Section 42 of the Code) of the Apartment Complex at the end of any taxable year prior to the taxable year starting January 1, 2004 be less than 95% of the amount of such basis at the close of the preceding tax year, except to the extent such shortfall in the qualified basis is due to an event of casualty or condemnation, provided that the General Partner is diligently proceeding to restore the Apartment Complex, or (IV) other than due to a change in the tax laws, the Partnership shall otherwise be in any situation where the amount of the Credits which the Partnership is entitled to claim under Section 42 of the Code be less than 95% of $244,456 (as such number is adjusted pursuant to Section 3.4.B(i) hereof) in any year during the Credit Period of the Partnership (other than any year therein in which Credits may not be claimed for 12 months) unless the Return Amount is paid in such year regardless as to whether such Return Amount would otherwise be due under Section 10.4;

        (iii)   Completion shall not have occurred by December 1, 2003 (provided, however, that if Completion is delayed due to Unavoidable Events, such date may be extended for the period of time that such Unavoidable Events cause a delay in Completion to occur, but in no event longer than three months), unless the Interest of the Limited Partner is purchased pursuant to the Development Deficit Guaranty Agreement; or

        (iv)   prior to the occurrence of Completion, (a) an uncured material default exists under any agreement or commitment entered into by the Partnership or binding thereon, or any such agreement or commitment shall have expired or shall have been terminated by any of the parties thereto and shall not have been extended, or (b) any Lender shall have commenced foreclosure proceedings against the Apartment Complex and such proceedings shall not have been stayed or dismissed within 30 days, unless the Interest of the Limited Partner is purchased pursuant to the Development Deficit Guaranty Agreement;

then, in any such event (a "Major Default") the Special Limited Partner shall have the right, but not the obligation, in its sole discretion, in its sole discretion, (y) upon ten days' prior written notice to such General Partner, in the case of the occurrence of an event specified in clause (i) of this Section 12.4.A, to remove such General Partner and all of such General Partner's Affiliates as General Partners of the Partnership and to appoint itself or any of its Affiliates to succeed such General Partner or such Affiliates as a General Partner of the Partnership in accordance with the provisions of Section 12.2 hereof, and (z) upon ten days' prior written notice to the General Partners, in the case of the occurrence of an event specified in clauses (ii), (iii) or (iv) of this Section 12.4.A, to remove any or all of the General Partners as General Partners of the Partnership and to appoint itself or any of its Affiliates to succeed such General Partner or General Partners as a General Partner of the Partnership in accordance with the provisions of Section 12.2 hereof.

        B.   The General Partners agree to indemnify and hold the Limited Partner and the Special Limited Partner harmless from and against all losses, costs and expenses incurred in connection with a Major Default (other than pursuant to Section 12.4.A(ii)(b) hereof) and the exercise of any of the remedies provided above, including, without limitation, all legal fees and other

65

expenses of the Limited Partner and the Special Limited Partner in connection with the transaction.

C. [Intentionally Deleted]

D. The removal of a General Partner pursuant to Section 12.4.A hereof (other than Section 12.4.A(i)(d) hereof) shall be treated for purposes of this Agreement as a voluntary Withdrawal of such General Partner from the Partnership. The removal of a General Partner pursuant to Section 12.4.A(i)(d) or 12.4.C hereof shall be treated for purposes of this Agreement as an Involuntary Withdrawal of such General Partner from the Partnership.

12.5  Additional General Partners.  At any time, the General Partners, with the Consent of the Special Limited  Partner (but the consent of the Limited Partner shall not be necessary), and subject to any applicable approvals of each Authority and each Lender, may admit an additional general partner to the Partnership with such share of the aggregate General Partners' Interest as shall be agreed upon between the General Partners and the additional general partner. Any additional general partner, as a condition of receiving any Interest, shall agree to be bound by the Project Documents and any other document required in connection therewith and by the provisions of this Agreement to the same extent and on the same terms as the General Partners.

12.6  Amendment of Schedule and Agreement.  Upon the admission of a successor or additional general partner or the Withdrawal of a General Partner, Schedule A attached hereto shall be amended to reflect such admission or Withdrawal and such amendment shall be filed as required by the Uniform Act. The General Partners may exercise the power of attorney granted in Section 15.2 hereof to effect the provisions of this Section 12.6.

12.7  Survival of Liabilities.  It is expressly understood that no Withdrawal, Assignment, pledge or encumbrance of a General Partner's Interest, even if it results in the substitution of the Assignee as a Partner, shall release the Withdrawing General Partner from any liability to the Partnership which shall survive such Withdrawal, Assignment, pledge or encumbrance, including those set forth in the Uniform Act.

ARTICLE XIII

DISSOLUTION AND TERMINATION OF THE PARTNERSHIP

13.1  Events Which Cause a Dissolution.  The Partnership shall continue in full force and effect until December 31, 2100, except that the Partnership shall be dissolved prior thereto upon the happening of any of the following events:

A. An election to dissolve the Partnership made in writing by the General Partners, with the Consent of the Special Limited Partner;

66

W247361.4

B.   The Withdrawal of a General Partner if the Partnership is not continued in accordance with Section 12.2 hereof;

C.   Any event which shall make it unlawful for the existence of the Partnership to be continued; or

D.   The sale or other disposition of all or substantially all of the assets of the Partnership.

13.2   Actions of Liquidating Agent Upon Dissolution.   Upon the dissolution of the Partnership, the Partnership shall be liquidated in accordance with this Article XII and the Uniform Act.   The liquidation shall be conducted and supervised by the General Partners or, if there is no remaining general partner, by a person who shall be designated for such purpose by the Special Limited Partner (the General Partners, or such person so designated, being hereinafter referred to as the "Liquidating Agent").   The Liquidating Agent shall have all of the rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership, and the Liquidating Agent is hereby expressly authorized and empowered to effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership.   The Liquidating Agent shall have the right from time to time, by revocable powers of attorney, to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith, and to fix the reasonable compensation of each such person, which compensation shall be charged as an expense of liquidation.   The Liquidating Agent is also expressly authorized to distribute the Partnership's property to the Partners subject to liens.

13.3   Statements on Termination.   Each Partner shall be furnished with a statement prepared by the Liquidating Agent which shall set forth the assets and liabilities of the Partnership as at the date of complete liquidation, and each Partner's share thereof.   Upon compliance with the distribution plan set forth in Section 13.4 hereof, the Limited Partner and the Special Limited Partner shall each cease to be a partner of the Partnership, and the Liquidating Agent shall execute, acknowledge and cause to be filed a certificate of termination of the Partnership.

13.4   Priority on Liquidation; Distribution of Non-Liquid Assets.

A.   The Liquidating Agent shall, to the extent feasible, liquidate the assets of the Partnership as promptly as shall be practicable.   To the extent the Proceeds are sufficient therefor, as the Liquidating Agent shall deem appropriate, the proceeds of such liquidation shall be applied in accordance with the provisions of Section 9.2.B(i) through (v) hereof, and the balance of such proceeds shall be distributed by the Liquidating Agent to the Partners pro rata in accordance with their respective Capital Accounts, as such accounts are determined after all adjustments are made as required herein to such accounts for the taxable year of the Partnership during which the liquidation occurs.

67

B.  If, in the sole discretion of the Liquidating Agent, he shall determine that it is not feasible to liquidate all or part of the assets of the Partnership or that an immediate sale of all or part of such assets would cause an undue loss to the Partners, the Liquidating Agent shall cause the fair market value of the assets not so liquidated to be determined by independent appraisal.  Such assets, as so appraised, shall be retained or distributed by the Liquidating Agent as follows (it being understood that the allocation of specific assets pursuant to this Section 13.4 shall require the Consent of the Special Limited Partner):

(i)  The Liquidating Agent shall retain assets having a value (which value shall be equal to the fair market value of such assets less the amount of any liability related thereto) equal to the amount by which the net proceeds of the liquidated assets are insufficient to satisfy the requirements of subparagraphs (i) through (v) of Section 9.2.B hereof; and

(ii)  Thereafter to the Partners pro rata in accordance with their respective Capital Accounts, as such accounts are determined after all adjustments are made as required herein to such accounts for the taxable year of the Partnership during which the liquidation occurs.

Any distribution of assets in kind shall be distributed on the basis of the fair market value thereof and any Partner entitled to any interest in such assets shall receive such interest therein as a tenant-in-common with all other Partners so entitled.  If the Liquidating Agent, in his sole discretion, deems it not feasible to distribute to each Partner an aliquot share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Partners as tenants-in-common as the Liquidating Agent shall determine to be fair and equitable, taking into consideration, inter alia, the basis for tax purposes of each asset distributed and the effect of crediting or charging the Capital Accounts for any unrealized appreciation or unrealized depreciation.

C.  Notwithstanding any other provision of this Article XII, in the event the Partnership is liquidated within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations but no Event specified in Section 13.1 hereof has occurred, the property of the Partnership shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up.  Instead, the Partnership shall be deemed to have distributed its property in kind to the Partners, who shall be deemed to have assumed and taken subject to all Partnership liabilities, all in accordance with their respective Capital Accounts.  Immediately thereafter, the Partners shall be deemed to have recontributed such property in kind to the Partnership, which shall be deemed to have assumed and taken subject to all such liabilities.

13.5  Orderly Liquidation.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities so as to minimize the losses normally attendant upon a liquidation.

13.6  No Goodwill Value.  At no time during continuation of the Partnership shall any value ever be placed on the Partnership name, or the right to its use, or to the goodwill appertaining to the Partnership or its business, either as among the Partners or for the purpose of determining the

value of any Interest, nor shall the legal representatives of any Partner have any right to claim any such value. In the event of a termination and dissolution of the Partnership as provided in this Agreement, neither the Partnership name, nor the right to its use, nor the same goodwill, if any, shall be considered as an asset of the Partnership, and no valuation shall be put thereon for the purpose of liquidation or distribution, or for any other purpose whatsoever; nor shall any value ever be placed thereon as between the remaining or surviving Partners and the legal representatives of the estate of any deceased, insane, incompetent, dissolved, liquidated or Bankrupt Partner.

## ARTICLE XIV

### Foreign Partners

#### 14.1 Certification of Non-Foreign Status.

A. Each Partner shall upon acquiring a Partnership Interest certify that he is not a Foreign Person on forms to be provided by the General Partners at the time of subscription. At any time that an Interest is transferred or assigned, the transferee shall certify to non-foreign status prior to the transfer or assignment of such Interest. Such certifications shall be made on a form to be provided by the General Partners.

B. Each Partner shall notify the General Partners if he becomes a Foreign Person within 30 days of such change.

C. Prior to a disposition of a United States Real Property Interest, a distribution attributable to a disposition of a United States Real Property Interest or any other distribution by the Partnership, each Partner may be required to certify to non-foreign status.

#### 14.2 Withholding of Certain Amounts Attributable to Interests of Foreign Partners.

A. In the event that either (i) the Partnership's actual or deemed amount realized upon disposition of any United States Real Property Interest is attributed to a Foreign Partner or (ii) the Partnership has effectively connected taxable income for any taxable year:

(i) any tax required to be withheld under Sections 1445 or 1446 of the Code shall be charged to that Foreign Partner's Capital Account as if the amount of such tax had been distributed to such Partner;

(ii) the General Partners shall have the right to make a loan to the Partnership in an amount equal to the amount of tax required to be withheld pursuant to Sections 1445 or 1446 of the Code to the extent that cash is needed to make the Sections 1445 or 1446 withholding payment attributable to that Foreign Partner; and

69

W247361.4

(iii)  the General Partners may retain appropriate portions of a Foreign Partner's distributions until any withholding obligations relating to that Foreign Partner are satisfied and may apply such distributions to repay any loan made pursuant to Section 14.2.A(ii) hereof.

B.  For the purposes of this Section 14.2, any person who fails to provide a certification of a non-foreign status when requested to do so by the General Partners shall be treated as a Foreign Person.

## ARTICLE XV

### Miscellaneous

15.1  Law Governing.  This Agreement shall be governed by and construed in accordance with the laws of the State applicable to contracts made and to be performed entirely therein.

15.2  Power of Attorney.  Each Partner hereby constitutes and appoints each General Partner who is an individual, each general partner of any General Partner which is a partnership and each of the President, each Vice President and the Secretary of any corporate General Partner, his true and lawful attorney-in-fact and agent with full power and authority to act in his name, place and stead to execute, acknowledge, swear to, deliver, file, record and publish any document requisite to carrying out the intention and purposes of the Partnership and this Agreement, including, but not limited to, the execution, acknowledgment, swearing to, delivery, filing, recording and publication of this Agreement and amendments thereto, documents, conveyances, leases, contracts, loan documents and/or counterparts thereof, the execution and filing of appropriate documents with any Authority or any Lender, and all other documents which such persons reasonably deem necessary or appropriate:

A.  To qualify or continue the Partnership as a limited partnership;

B.  To reflect a modification of the Partnership or an amendment of this Agreement;

C.  To reflect the dissolution and termination of the Partnership; or

D.  To effect transfers, admissions, withdrawals and substitutions of Partners as specifically provided under the terms of this Agreement.

No person shall take any action as an attorney-in-fact of any Limited Partner or any Special Limited Partner which is not authorized by the terms of this Agreement or would in any way increase the liability of such Partner beyond the liability expressly set forth in this Agreement.  This power of attorney may be revoked by any Partner by written notice of revocation (the "Notice of Revocation") to the General Partners.  Upon receipt by the General Partners of a Notice of Revocation, the General Partners shall file with the appropriate office or agency an amendment to this Agreement reflecting such revocation; provided, however, that until such amendment is filed, any party may rely on this

70

power of attorney as being valid.

15.3  Counterparts.  This Agreement may be signed in any number of counterparts, each of which shall be an original for all purposes, but all of which taken together shall constitute only one agreement. The production of any executed counterpart of this Agreement shall be sufficient for all purposes without producing or accounting for any other counterpart thereof.

15.4  Partners Independently Bound.  The General Partners, the Special Limited Partner and the Limited Partner shall become bound by this Agreement immediately upon its execution thereof and independently of the execution hereof by any other Partner.

15.5  Separability of Provisions.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein (A) are determined to be invalid or contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid or (B) would cause any Limited Partner or any Special Limited Partner to be bound by the obligations of the Partnership (other than under the rules, directives and regulations of any Authority) under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

15.6  Address and Notice.  All notices, demands, solicitations of consent or approval, and other communications hereunder required or permitted shall be in writing and shall be deemed to have been given when personally delivered or five days after the date when deposited in the United States mail and sent postage prepaid by registered or certified mail, return receipt requested, addressed as follows:  if intended for (A) the Partnership, to its principal place of business or (B) the Partners, to their respective addresses set forth on Schedule A, or to such other address which any Partner shall have given to the Partnership for such purpose by notice hereunder; provided, however, that copies of all such items (which shall not constitute notice hereunder) shall also be sent to Nixon Peabody LLP, 401 9th Street, NW, Suite 900, Washington, DC 20004, Attention:  Richard S. Goldstein, Esq. and Coolidge, Mathieu, Barrington Berube & Couture, 98 High Street, PO Box 271, Somersworth, New Hampshire 03878, Attention:  Brian R. Barrington, Esq.

15.7  Computation of Time.  In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.

15.8  Titles and Captions.  All article and section titles or captions contained in this Agreement are for convenience only and shall not be deemed part of the text of this Agreement.

15.9  Entire Agreement.  This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements between and among them respecting the subject matter of this Agreement.

15.10  Agreement Binding.  This Agreement shall be binding upon and inure to the

W247361.4

benefit of the heirs, executors, administrators, legal representatives and permitted successors and assigns of the parties hereto.

15.11  Parties in Interest.  Nothing herein shall be construed to be to the benefit of or enforceable by any third party including, but not limited to, any creditor of the Partnership.

15.12  Amendments; Other Actions.

A.  This Agreement may not be amended or modified except by the General Partners with the Consent of the Special Limited Partner and the approval, if required, of each Authority; provided, however, that all Partners must give their consent in writing to any amendment which would (i) extend the term of the Partnership as set forth in Section 13.1 hereof, (ii) amend this Section 15.12, (iii) increase or extend the liability or obligation of any Limited Partner or any Special Limited Partner, (iv) increase the amount of Capital Contributions payable by any Limited Partner or any Special Limited Partner, (v) accelerate the date of payment of any Installment or (vi) alter the distribution or allocation to the Partners of any profits and losses and distributions of the Partnership; and provided further, however, that the Investor Limited Partners may, without the consent of the General Partners, amend or modify this Agreement in any manner which does not modify in any manner or to any extent the rights, privileges or liabilities of the General Partners hereunder.

B.  Notwithstanding any other provision of this Agreement, no action may be taken under this Agreement unless such action is taken in compliance with the provisions of the Uniform Act.

C.  The General Partners acknowledge and agree that upon receipt of written notice from the Limited Partner that it desires to exercise the right of the Special Limited Partner to Consent to the actions specified in Sections 5.5B(i), (iv), (x), (xi), (xii) or the rights exercisable under Section 11.4, including the right to appoint a successor General Partner upon the removal of a General Partner, such rights shall be exercisable exclusively by the Limited Partner and this Agreement shall be deemed to have been so amended to reflect that such rights are to be exercised exclusively by the Limited Partner.

15.13  Survival of Representations, Warranties and Agreements.  All representations, warranties and agreements shall survive until the dissolution and termination of the Partnership, except to the extent that a representation, warranty or agreement expressly provides otherwise.

15.14  Further Assurances.  The Partners will execute and deliver such further instruments and do such further acts and things as may be required to carry out the intent and purposes of this Agreement.

15.15  Remedies Cumulative.  No remedy conferred upon or reserved to the Partnership or any Partner by this Agreement is intended to be exclusive of any other remedy.  Each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the

72

Partnership or any Partner hereunder or now or hereafter existing at law or in equity or by statute.

      15.16 <u>Meetings</u>. Meetings of the Partnership may be called by the General Partners or by the Special Limited Partner for any matters for which the Partners may vote as set forth in this Agreement or to obtain information concerning the Partnership. A list of names and addresses of all Partners shall be maintained as part of the books and records of the Partnership and shall be made available upon request to any Partner or its representative at cost. Upon receipt of a request either in person or by registered mail stating the purposes of the meeting, the General Partners shall provide the Partners, within ten days after receipt of such request, written notice of a meeting and the purpose of such meeting to be held on a date not less than 15 nor more than 30 days after receipt of such request, at a time and place within or without the State convenient to the Partners.

73

IN WITNESS WHEREOF, this Agreement has been duly executed on the day and year first above written.

GENERAL PARTNERS

FRANCOEUR SENIOR HOUSING, LLC

By:
Name: DAVID A. FRANCOEUR
Title: Member / MANAGER.

SOMERSWORTH   COMMUNITY   DEVELOPMENT CORPORATION

By:
Name: Joseph N. Couture.
Title: Arca. Pir.

74

SPECIAL LIMITED PARTNER

RELATED DIRECT SLP LLC

By: _____
      Name:   Marc D. Schnitzer
      Title:    Executive Vice President


LIMITED PARTNER

RCC CREDIT FACILITY, L.L.C.

By: _____
      Name:   Marc D. Schnitzer
      Title:    Executive Vice President

W247361.4

WITHDRAWING LIMITED PARTNERS

Capital Ideas, Inc.

By: _____

Name:  Michael Richardson

Title:  Principal

76

SCHEDULE A TO

THE AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF

[NAME OF PARTNERSHIP]

dated as of <u>May 1</u>, 2003

| General Partners | Capital Contribution |
|---|---|
| Francoeur Senior Housing, LLC | $1.00 |
| Somersworth Community Development Corporation | $1.00 |

Special Limited Partner

Related Direct SLP LLC.                          $1.00
625 Madison Avenue
New York, New York  10022

Limited Partner

RCC Credit Facility, L.L.C.          $1,911.000, subject to Article III
625 Madison Avenue
New York, New York  10022

77

Exhibit A

PLEDGE AGREEMENT dated as of May 1, 2003, between RCC Credit Facility, L.L.C., a Delaware limited liability company (the "Limited Partner") and Related Direct SLP LLC., a Delaware limited liability company (collectively, with the Limited Partner, the "Pledgors") and Maple Street Senior Housing Limited Partnership, a New Hampshire limited partnership (the "Partnership" or the "Pledgee").

## W I T N E S S E T H:

WHEREAS, the Pledgors and Francoeur Senior Housing LLC and Somersworth Community Development Corporation (the "General Partners") have entered into an Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of the date hereof (the "Partnership Agreement"), pursuant to which the Pledgors were admitted as limited partners of the Partnership;

WHEREAS, pursuant to Section 3.4 of the Partnership Agreement, the Limited Partner has agreed to contribute $1,624,350 (the "Contribution") to the capital of the Partnership upon satisfaction of certain conditions set forth in the Contribution Agreement by and between the Partnership, Limited Partner and General Partner;

WHEREAS, the obligation of the Limited Partner to make the Contribution is evidenced by a promissory note of even date herewith issued by the Limited Partner to the Partnership (the "Note"); and

WHEREAS, it is a condition to the execution of the Partnership Agreement that this Pledge Agreement be executed and delivered by the Pledgors.

NOW, THEREFORE, in order to induce the General Partners to execute the Partnership Agreement, it is hereby agreed as follows:

(1)     The Security.  The Pledgors hereby assign to the Pledgee as collateral security for payment of the Note, and grant to the Pledgee a security interest in, all right, title and interest in the limited partnership interests (the "Interests") owned by the Pledgors in the Partnership.

(2)     Remedies Generally. Upon the occurrence and continuation of any breach or default, or event which, with the giving of notice or lapse of time, or both, would constitute a breach or

78

W247361.4

default, under the Note by the Limited Partner (an "Event of Default"), the Pledgee shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any applicable jurisdiction.

   (3) <u>Additional Remedies</u>.

     (a)  Unless an Event of Default shall have occurred and be continuing, the Pledgors shall be entitled to exercise all of the rights under the Partnership Agreement and to receive all of the benefits thereunder as if the Interests were not collateral subject to this Agreement.

     (b)  If an Event of Default shall have occurred and be continuing, the Pledgee or its nominee may, but shall have no obligation to, (i) exercise any rights under the Partnership Agreement and take title in its own name to the Interests, (ii) amend or modify, or grant consents or waivers, under the Partnership Agreement and (iii) receive all moneys and property which become due to the Pledgors under the Partnership Agreement.

   (4) <u>Power to Sell Collateral</u>.  Upon any sale of all or any portion of the Interests, whether made under a power of sale given in this Agreement or under judgment, order or decree in any judicial proceeding for the foreclosure or involving the enforcement of this Agreement:  (a) the Pledgee may bid for and purchase the property being sold, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property in its own absolute right without further accountability, and may, in paying the purchase money therefore, deliver an assignment of any or all of its rights with respect to the Note, which shall be deemed to have a value equal to the unpaid principal and interest of or on the rights with respect to the Note being assigned, in lieu of cash in payment of the amount which shall be payable thereon; (b) the Pledgee may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale and instrument of assignment and transfer of the property sold; (c) the Pledgee is hereby irrevocably appointed the true and lawful attorney-in-fact of the Pledgors in their name and stead, to make all necessary deeds, bills of sale and instruments of assignment and transfer of the property thus sold and for such other purposes as are necessary or desirable to effectuate the provisions of this Agreement, and for that purpose it may execute and deliver all necessary deeds, bills of sale and instruments of assignment and transfer, and may substitute one or more persons with like power, the Pledgors hereby ratifying and confirming all that their said attorneys, or such substitute or substitutes, shall lawfully do by virtue hereof; but if so requested by the Pledgee or by any purchaser, the Pledgors shall ratify and confirm any such property, deeds, bills of sale, instruments of assignment and transfer and releases as may be designated in any such request; (d) all right, title, interest, claim and demand whatsoever, either at law or in equity or otherwise, of the Pledgors of, in and to the property so sold shall be divested; such sale shall be a perpetual bar both at law and in equity against the Pledgors, their successors or assigns; (e) the receipt of the Pledgee or its sale for his or their purchase money, and such purchaser or purchasers, and his or their assigns or personal representatives, shall not, after paying such purchase money and receiving such receipt of the Pledgee or of such agent therefor, be obliged to see to the application of such purchase money or be in any wise answerable for any loss, misapplication or nonapplication

79

thereof; and (f) to the extent that they may lawfully do so, the Pledgors agree that they will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit of advantage of, any appraisement, valuation, stay, extension or redemption laws, or any law permitting them to direct the order in which the Interests or any portion thereof shall be sold, now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance or enforcement of the Note or this Agreement, and the Pledgors hereby expressly waive all benefit or advantage of any such laws and covenant that they will not hinder, delay or impede the execution of any power granted or delegated to the Pledgee in this Agreement, but will suffer and permit the execution of every such power as though no such laws were in force.

(5)     Application of Moneys; Deficiency. Except as otherwise provided herein, all moneys which the Pledgee shall receive in accordance with the provisions hereof shall be applied (to the extent thereof), first to the payment of all costs and expenses incurred in connection with the administration and enforcement of, or the preservation of any rights under, this Agreement or any of the reasonable expenses and disbursements of the Pledgee (including, without limitation, the reasonable fees and disbursements of its counsel and agents) in connection therewith; second to the payment and satisfaction of the Note; and third to the payment of any excess to the Pledgors.

(6)     Covenant of the Pledgors. The Pledgors will, at their own expense, make, execute, endorse, acknowledge, file and/or deliver to the Pledgee from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments and take such further steps relating to the Interests as the Pledgee may require.

(7)     Remedies Cumulative. The remedies provided herein in favor of the Pledgee shall not be deemed exclusive, but shall be cumulative, and shall be in addition to all other remedies in favor of the Pledgee existing at law or in equity. Without limiting the foregoing, the Pledgee may exercise its rights with respect to a portion of the Interests without then, theretofore or thereafter exercising its rights with respect to any other portion of the Interests, and may exercise any of its rights under this Agreement without obligation to resort to other security.

(8)     No Waiver. No delay on the part of the Pledgee in exercising any of its rights, remedies, powers and privileges hereunder or partial or single exercise thereof, shall constitute a waiver thereof. None of the terms and conditions of this Agreement may be changed, waived, modified or varied in any manner whatsoever unless in writing duly signed by the party to be charged. No notice to or demand on either of the Pledgors in any case shall entitle either of the Pledgors to any other or further notice or demand.

(9)     Continuation in Force. The obligations of the Pledgors hereunder shall remain in full force and effect without regard to, and shall not be impaired by, (a) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of either of the Pledgors, (b) any exercise or nonexercise, or any waiver of, any right, remedy, power or privilege

80

under or in respect of the obligations or this Agreement, or any other security therefor other than as expressly provided in this Agreement or (c) any amendment to or modification of the Note, any documents or instruments delivered in connection therewith or any other security therefor, whether or not the Pledgors shall have notice or knowledge of any of the foregoing.

(10)    Binding Effect.  This Agreement shall be binding upon the Pledgors and their successors and assigns and shall inure to the benefit of the Pledgee and its successors and assigns, except that the Pledgors may not transfer or assign any of their obligations, right or interests hereunder without the prior written consent of the Pledgee.  All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and any sale of any portion of the Interests.

(11)    Notices.  Notices hereunder shall be sent to the party or parties entitled thereto by certified or registered mail, return receipt requested, at their respective addresses set forth below, or at such address or addresses as may be specified by the party entitled to such notices in accordance with the provisions of this paragraph.  Any such notice shall be deemed given on the date so mailed.

(12)    Termination.  This Agreement and the security interest granted herein shall terminate immediately after payment of the Note has been made.  The Pledgee agrees that upon such termination it will take such action as is necessary to terminate the security interests granted herein and the effectiveness of all financing statements and other instruments filed with respect thereto.

(13)    Headings.  The descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not in any way affect the meaning of or construction of any provision of this Agreement.

(14)    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceabilty without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(15)    Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and be governed by the laws of the State of New Hampshire applicable to contracts made and to be performed entirely therein.

(16)    Performance Unchanged.  It is expressly agreed, anything herein or in the Partnership Agreement contained to the contrary notwithstanding, that the Pledgors shall remain liable to perform all of the obligations, if any, of theirs with respect to the Interests, and the Pledgee shall not have any obligations or liabilities under the Partnership Agreement by reason of or arising out of this Agreement, nor shall the Pledgee be required or obligated in any manner to perform or fulfill any of the obligations of the Pledgors pursuant to the Partnership Agreement; provided, however, that the

81

W247361.4

Pledgee acknowledges that the Note is without recourse to the Limited Partner and that the sole source of payment for the Note or under this Agreement, if the Pledgors do not agree to make such payment, shall be the Interests and the Pledgee's interest therein hereunder.

IN WITNESS WHEREOF, the undersigned have executed this Pledge Agreement as of the first date set above.

[SIGNATURES ON FOLLOWING PAGE]

82

W247361.4

PLEDGORS:

RCC CREDIT FACILITY, L.L.C.

address:

    625 Madison Avenue
    Fifth Floor
    New York, New York  10022

By: _____
    Marc D. Schnitzer
    Executive Vice President

RELATED DIRECT SLP LLC

address:

    625 Madison Avenue
    Fifth Floor
    New York, New York 10022

By: _____
    Marc D. Schnitzer
    Executive Vice President

83

W247361.4

PLEDGEE:  Maple Street Senior Housing Limited Partnership

address:  828 Central Avenue
          Dover, NH 03820


By:     Françoeur Senior Housing, LLC
        general partner

        By: _____
        Name: DAVID - A. FRANCOEUR.
        Title: member / MANAGER

By:     Somersworth Community Development Corporation

        By: _____
        Name: Josin N Couture
        Title: Exec Dir

84

Exhibit B

## CAPITAL NOTE

For value received, RCC Credit Facility, L.L.C.., a Delaware limited liability company (the "Limited Partner"), promises to· pay to Maple Street Senior Housing Limited Partnership, a New Hampshire limited partnership (the "Partnership") at 828 Central Avenue, Dover, New Hampshire 03820 or at such other address as the Partnership shall in writing direct, the principal sum of One Million Six Hundred Twenty Four Three Hundred Fifty Dollars ($1,624,350), without interest, upon satisfaction of the conditions set forth in Section 3.4.A(ii) of the Partnership Agreement (hereinafter defined).

This Note evidences the obligation of the Limited Partner to pay a portion of the capital contributions for its Interest in the Partnership as provided in the Amended and Restated Certificate and Agreement of Limited Partnership of the Partnership (the "Partnership Agreement") and shall be subject to the provisions of Section 3.4 of that agreement. Capitalized terms not defined herein shall have the meaning provided in the Partnership Agreement.

Subject to the provisions of Section 3.4 of the Partnership Agreement, payment shall be due hereunder within 20 days after all of the conditions to payment of this Capital Note have been satisfied and receipt by the Limited Partner of written notice from the Partnership of such occurrence. If the Limited Partner disputes the occurrence of any event entitling the Partnership to payment, payments hereunder shall be deferred until the resolution of such dispute; provided, however, that if the Limited Partner fails to contest the matter in good faith and it is subsequently determined that the Partnership was so entitled to payment, the Limited Partner shall pay interest on the payment at the Penalty Rate (as hereinafter defined) from the end of the 20-day period of the date of payment.

Neither the Limited Partner nor any Partner thereof (whether a general partner or a limited partner thereof) nor any other Person shall have any personal liability for payment of any amount due under this Note, or the performance of any obligation under or arising pursuant to this Note and, in the event of any default hereunder, the Partnership (and its successors and assigns) shall look only to the Interest for performance hereunder. If, pursuant to the Partnership Agreement or any instruments executed or delivered incident thereto, the Limited Partner shall be entitled to any right of indemnification, then, without limiting any other right of the Limited Partner as provided in the Partnership Agreement or any other instrument, the Limited Partner shall have the right to set off against its payment obligations under this Note the sum of (i) the amount of the obligations for which the Limited Partner is entitled to indemnification, and (ii) interest on such amount, for the date on which such right of set-off arises until the date of receipt of the payment in connection with which

85